EUGENE C. KENDRICK ET AL., APPELLEES, V. HOWARD G. FURMAN, APPELLANT.

FILED FEBRUARY 20, 1908.   No. 15,044.

1. Evidence: OPINIONS OF WITNESS. Where it is claimed that the construction of a dam has caused the bed of a river to fill in with silt and the water of the river to back up, so as to interfere with the operation of a water-wheel, a question calling for the opinion of the witness upon the very matter in issue is improper, and the answer thereto should be excluded.

2. ———: DAMAGES. Where one claims his property has been damaged by certain acts of the defendant, it is not proper to ask the witness in what manner he has been damaged, but he should state the facts, and the jury will then in the exercise of its functions find whether the litigant has been damaged.

3. Evidence examined, and *held* to entitle appellees to an injunction against appellant.

APPEAL from the district court for Dawes county: WILLIAM H. WESTOVER, JUDGE. *Reversed in part.*

*A. W. Crites,* for appellant.

*J. E. Porter, contra.*

ROOT, C.

This was an action brought to the district court for Dawes county by appellees for an injunction and judgment for damages against appellant. It seems that A. J. Palmer and another in 1887 acquired title to a tract of land bisected by the Niobrara river. In 1892 and 1893 Palmer constructed an irrigation plant and water power mill upon his land, so as to receive the water from the said river to supply both his power for the mill and water

for his ditches. The state board of irrigation in 1898 made an order stating that Palmer & Company were entitled to seven and one-seventh cubic feet of water a second for irrigation purposes, dating by way of priority from August 1, 1887, and to 10 cubic feet a second of water for power purposes from August 1, 1893. Appellant owns land on each side of the Niobrara, and just immediately east of and below the land owned by Palmer. In January, 1894, appellant posted a notice of his proposed diversion of the water of said river for irrigation purposes, filed a copy thereof with the county clerk in February following, and on the 2d day of January, 1895, filed his claim with the state board of irrigation, which board thereafter passed upon and allowed said claim to the extent of three and nine-fourteenths cubic feet of water a second of time. In the spring of 1894 appellant and said Palmer conferred about the construction of a dam to enable appellant to divert water for an irrigation system. Palmer desired that the dam be constructed above the outlet of his (Palmer's) tailrace, but appellant refused, for the admitted reason that he wanted the dam and head gate on his own land, and further desired the benefit of the water returned to the river through Palmer's tailrace. Appellant then selected a site, and requested Palmer to survey for the ditches, dam and head gate. This point, following the thread of the stream, was about one-half mile below the mill, but in a direct course was considerably less. It seems to have been the mutual desire of appellant and Palmer that the dam be so constructed as not to interfere with the operation of the mill. The water for the mill was diverted something over a mile above the mill site, and was conducted thereto in a ditch or race so constructed that at the mill a very considerable fall was produced by permitting the water to flow down, upon, and over a turbine wheel, and thence through a draft tube to the tailrace, whence it escaped back to the river. The water-wheel was firmly attached to a shaft upon which a belt-wheel was affixed. On the ground at the head of the

tailrace, under the penstock, was a platform foundation of timber, the floor of which was 12 inches higher than the bed, and this floor seems to have been the initial point from which Palmer took his levels in surveying for appellant's dam. It was apprehended by Palmer that the dam constructed below his mill would back the water up so that, instead of the waste water flowing free from the water-wheel, and thence into the river through the tailrace, it would be retarded in its flow, back up and collect so as to interfere with the action of the water and the pulley-wheel. Palmer then, so he claims, indicated a level to which appellant might raise his dam and still leave a fall of 18 inches from the initial point to the top of the water flowing over the dam, which Palmer deemed sufficient. The dam, ditches and head gate were constructed, and for a time the mill was operated without interference from backwater or ice. In 1890 appellees purchased the mill, irrigation and other water rights from Palmer, and it is claimed by appellees that subsequently thereto appellant raised his dam, and in consequence thereof the waters of the river were backed up so that they submerged the lower part of the water-wheel and pulley, caused the belt to slip, interfered with the free discharge of the water through the draft tube and tailrace, and brought about such a condition as that the mill could not be operated. Furman denied raising his dam to a greater height than indicated by Palmer's survey, and claims that he has a license from Palmer, which is binding on appellees, to maintain the dam in the situation it was at the time the suit was commenced. He also claims that the piling of a wagon bridge constructed across the river at a point between the water wheel and the dam, the existence of a bend in the river, and the washing down from the canyons of debris into the river just above the bridge, caused the condition now existing. The cause was submitted to a jury, which returned a general verdict for the appellees, awarding them $250 damages. Ten special findings were returned, and thereafter the court made special findings

upon which it entered an injunction perpetually restraining appellant from maintaining the top of his dam to a greater height than 18 inches below the top of the floor of appellees' penstock. Judgment was rendered on the verdict, and Furman appeals.

1. Upon the trial to the jury, the witness Hazard, over appellant's objections, was permitted to answer the question: "Now, what causes this sand, if you know, Mr. Hazard, to back up there?" He answered: "Well, there is only one thing I could reasonably account for; that is, the dam preventing the flow of the water carrying the sand off." The witness Poole, over appellant's objections, was permitted to answer the question: "Now, do you know what caused this water to back up this way?" He said: "From Mr. Furman's dam." The questions include the very substance of the issue to be determined by the jurors, and the acceptance by them of those answers relieved the jurors from ascertaining from competent evidence the very fact at issue in the case. The testimony invaded the province of the jury, and should not have been permitted. *Combs v. Agricultural Ditch Co.,* 17 Colo. 146; *In re Estate of Cheney,* 78 Neb. 274.

Over appellant's objection, one of the appellees was permitted to answer the question: "Now, you may tell the jury what damage you have suffered by reason of this water being backed up the way you have described during these three years?" The response was: "Why, it has been considerable damage from our grinding, and in getting across back and forth during the winter, *and it has ruined our water place, which is a great deal.* We have lost several head of cattle; the water would rise up over the ice and then go down again, and we have lost several head of cattle, which was no small loss." Appellant moved to strike out the answer as incompetent, irrelevant, immaterial, remote and speculative. The court sustained the motion only as to the loss of the cattle. Further in the witness' examination he was permitted to say appellees had suffered damage by reason of the water submerging the

public road and the land between their house and the road,
and, further, over objections as to competency, materiality
and relevancy, he was permitted to answer the question:
"Now, in what way did you suffer damages?"  And in
answer said: "We had the school teacher boarding there,
and from time to time we had to carry her across so she
could go to school."  Appellant moved to strike out the
answer as not a proper measure of damages, which was
overruled, and the witness continued that the teacher "left
and went to boarding some place else," and this answer
the court refused to suppress.  Not only did these ques-
tions permit the witness to assume he had been damaged,
an issue of fact for the jury to determine, but their lan-
guage was so general that opposing counsel could not
possibly anticipate the answer that might follow, and
thereby interpose an objection to answers responsive to
the question, and yet incompetent and immaterial.  The
answers well illustrate the possibilities lurking in that
class of interrogations—that their water place had been
ruined; that they had lost several head of cattle, and a
school teacher had gone elsewhere to board.  The court
eliminated the loss of the cattle and permitted the re-
mainder of the answers to stand, and thereby permitted
the jurors to believe that the loss of the teacher's society
and the injury to the watering place were elements of dam-
age in the case, notwithstanding they are not mentioned
in the itemized statement of damages, and their question-
able cause for recovery in any event.  When we consider
the rather meager basis for the support of the verdict for
$250 damages, the prejudice to appellant from this class
of testimony seems fixed and certain.  *City of Omaha v.
Kramer*, 25 Neb. 489; *Jameson v. Kent*, 42 Neb. 412;
*Combs v. Agricultural Ditch Co., supra.*  Appellees pro-
duced testimony to show that by virtue of the loss of power
they had been compelled to run a hand separator for some
five months from May to September in 1903; that the
work could have been done in from one to two hours less

54

time each day by the use of the water-power; that a man cost them 12 cents an hour, and thereby the jury might have included some $27 for this item of damages; that the submerging of their land destroyed certain strawberry plants, pie-plant and currant bushes of the value of $25; that they were deprived during two winter seasons of the revenue they would have earned from sawing wood and grinding feed. They mention two instances of persons who desired to have feed ground, and one of appellees states that he estimates that they lost the grinding in each season of from 400 to 500 tons of feed, for which they were charging 10 cents a hundred, but there is not a particle of evidence in the record to show what expense appellees would have incurred in grinding this grain for feed, and it is beyond the power of any person to ascertain from the record the net loss accruing to appellees by virtue of their inability to grind grain, or saw wood, either for themselves or the public. The same condition exists relative to the grinding of sickles. The missing facts could have been produced, and the jury advised of every material fact essential for a logical and just deduction of appellees' damages in the loss of the use of their water-power, if any they suffered. It will be kept in mind that the mill was situated distant from town, and did not enjoy a continuous run of trade.

2. We are satisfied from a careful reading of the entire record that the findings of the court and its judgment of injunction should be affirmed. The sole issue presented on this branch of the case is one of fact, and we have reached our conclusion independently of the findings of the jury and those of the trial court. It is not disputed that the mill was constructed and water for its use appropriated prior in time to the construction of appellant's dam. It is also admitted and conceded all around that appellees' grantor surveyed and staked out the location of appellant's dam, head gate and ditches. Appellant states: "I told him (Palmer) I would like to have him run my ditch and set the stake of my head gate, and that I

wanted—that we should figure on 18 inches of water under a 4-inch pressure, and I wanted to get up as high as I could without interfering with the mill; and I told him, if possible, I would like to get it up on the ground down there at the house, and for him to get it just as high as he could without interfering with the mill. And he suggested that I should go above the mill, but I told him that I wanted the water he used in the mill to irrigate with, and for him to put it down there so it wouldn't interfere with the mill." Now, Palmer was not only the mill-owner, but a surveyor as well, and it seems reasonable to hold that Palmer fixed, as he says he did, the initial point upon the top of the floor of his penstock; that from that point he estimated the levels and the height to which the dam might be constructed so that the backing of the water would not attain a point where it would interfere with the operation of his wheel. Appellant insists that the head gate, and not the floor of the penstock, was the basis from which the parties must work out the agreement, but the head gate is so constructed that the dam may be raised a considerable additional height and still the head gate furnish an outlet into the ditch for the water of the Niobrara. Palmer testifies that he ran the level from the foot of his wheel to the top of the proposed dam. "Q. You took the foot of your wheel or the floor of the race as your starting point, did you not? A. The top of the water; yes. Q. Did you take the top of the water or the floor of the race? A. I took the top of the water as the water would flow out from the wheel. Q. And you didn't start from the floor of the race? A. Yes; that would be the floor of the race, the top of the water when the wheel was open. There was a timber there, and when the wheel was running the water started right at the top of that, and I set the instrument on that timber. Q. Now, how much was his dam below—how much lower was the top of his dam, as you located it? A. I don't know anything about the top of his dam. I know where I gave him the top. Q. How much lower was that level than the floor

of your race, 15 inches below the wheel? A. It was 18 inches that I gave him from the top of this timber; that is where I started my bench, and run my level from there, and where I showed him the top of the water would be 18 inches below that." Witness says he preserved his field notes, and inspected them shortly before testifying. The fact seems to be that Furman's improvements did not interfere with the water-power from 1894 till some time about 1900, so it would seem that, if Palmer's survey was followed in the construction of the Furman dam, he had provided a margin of safety for the use of the dam so far as the water-wheel was concerned. Palmer, Eugene C. Kendrick and Humphrey Kendrick testify that Furman has raised the dam since its original construction. Eugene C. Kendrick says that the first summer they owned the mill the water stood but 16 inches in Furman's head gate, and in the fall of 1903 it was 33 to 34 inches. Both Eugene and Humphrey Kendrick testify that Furman admitted to them he had raised the dam. One witness says he said he had raised it a foot. Appellant does not deny these statements. Both Furman and his son testify the dam has not been raised higher than it was originally constructed, but that every year the dam would sink down by reason of the decay of material used in its construction, and because of the quicksand in the bottom of the river. There is testimony tending to show that appellant's ditch has filled with silt and sand, and that the ditch has not been cleaned out, so that the water must be raised higher in order to flow into and through the ditch than at the time it was first constructed; and that proper construction of a dam, in position like Furman's, calls for a sluiceway to permit the water to be drawn off in the winter time when not used for irrigation, and to assist in carrying off the silt and sand that accumulate above the dam. On the other hand, there is testimony to show the Furman dam is constructed in the same way as most of the dams built for irrigation purposes, and this we do not doubt, but in none of the other instances was it necessary to guard

against damage to an upper mill-owner, as in the instant case. Various measurements were taken and testified to by as many surveyors, but the trial court did not seem satisfied with their results, so he, with the co-operation of the parties, secured Paige Francis, a civil engineer and under-secretary of the state board of irrigation, to run the levels and report the facts to the court, and Francis testifies that the water below Furman's dam was two and eight-tenths feet lower than the floor of appellees' penstock, and that the crest of the water as it fell over the dam was eight-tenths of a foot lower than said initial point. There is testimony in the record establishing the fact that between the water-wheel and the dam a bridge has been constructed, and that the pilings supporting the superstructure thereof obstruct the free flow of ice floating in the water; that there is a horseshoe bend in the river below the bridge and above the dam; also that canyons empty storm-water and debris into the river above the dam and below the water-wheel, and particularly that a quantity of sand, gravel and other debris was forced down through one canyon and into the river just above the bridge. There is also testimony to the effect that the floor of the tailrace is considerably lower than the surface of the water in the river opposite both the head and exit of the tailrace, and lower than the bed of the river just above the bridge. Appellees, however, contend that, with the Furman dam maintained not to exceed 18 inches below the floor of their penstock, the action of the water from the tailrace would scour a path from the tailrace down stream, and thereby an exit would be furnished for the escape of the water used to operate the water-wheel.

The evidence to us seems to preponderate in favor of appellees on the issues of the license granted appellant by Palmer, the height of the dam and the effect of present conditions upon the operation of appellees' water-wheel, and we find they were entitled to the injunction granted by the trial court.

We therefore recommend that the judgment of the lower

court awarding appellees damages be reversed and remanded, and that in all other things the judgment of said court be affirmed.

FAWCETT, C., concurs in the conclusion, but not in all of the reasoning.

CALKINS, C., concurs.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the lower court awarding appellees damages is reversed and remanded, and in all other things the judgment of said court is affirmed.

JUDGMENT ACCORDINGLY.