G. D. GRACE, (PLAINTIFF), RESPONDENT, v. UNION ELECTRIC COMPANY, OF MISSOURI, A CORPORATION, (DEFENDANT), APPELLANT.—200 S. W. (2d) 364.

Kansas City Court of Appeals. Opinion delivered February 1, 1947.

*Igoe, Carroll, Keefe & Coburn, Richmond C. Coburn, Thomas L. Croft, Kay & Starling, Harry R. Kay* and *Montgomery, Martin & Salveter* for (defendant) appellant.

*John A. Woodbridge* of counsel.

1212

*F. M. Brady* and *Lamm & Barnett* for respondent.

CAVE, J.—This is an action for damages to plaintiff's crops and fences resulting from an overflow of his land alleged to have been caused by an obstruction of the Osage River by a dam owned and operated by the defendant. For clarity, we will refer to the parties as they were in the trial court, plaintiff and defendant.

The trial to a jury resulted in a verdict and judgment for plaintiff in the sum of $750, from which defendant perfected its appeal. In substance the petition alleges that defendant maintained and operated a dam across the Osage River near Bagnell, Missouri; that the maintaining and operation of said dam and obstruction in and across the Osage caused water to be impounded, held back and retarded in its natural flow down the Osage River and tributaries and caused the water to cover and flood land and premises adjacent to and in the vicinity of the Osage and its tributaries; that defendant so operated and maintained said dam and obstruction during May, 1943, at which

time plaintiff lived upon and was engaged in farming 160 acres of land located in the vicinity of Whig Creek and the Pomme de Terre River, both tributaries of the Osage River; that during May, 1943, flood waters from the Osage River which had been impounded (commonly called Lake of the Ozarks), overflowed and backed up on the land and premises of the plaintiff, causing damage to his crops and fences.

Defendant's answer admitted its organization as a corporation, but denied every other allegation in the petition. Further, the defendant alleged that it at all times since October 15, 1931, had owned, maintained and operated a large and permanent dam and hydro-electric generating plant across the Osage River near Bagnell, Missouri; that said dam does impound water, commonly known as the "Lake of the Ozarks;" and that said dam and hydro-electric generating plant were built and are maintained and operated by the defendant by virtue of a license designated as "Project No. 549, Missouri," issued by the Federal Power Commission pursuant to law.

At the close of plaintiff's evidence defendant presented its motion for directed verdict, which was overruled, and it declined to offer any evidence and renewed its motion for directed verdict, which was denied.

Defendant assigns four grounds of error: (1) In overruling its objection to certain testimony of witness Ferguson; (2) in overruling its objection to the testimony of witness Benberg; (3) in giving plaintiff's instruction No. A, and (4) in overruling its motion for a directed verdict, because the proof failed to establish a submissible case for the jury.

It will clarify the discussion some if plaintiff's theory is stated at the inception of the opinion. He does not contend that the dam was unlawfully or negligently constructed or that defendant failed to use reasonable care "to open the flood gates during the 1943 flood." His theory is that while the case sounds in tort "it is not in any sense based upon negligence as such;" but is founded on the premises that defendant "erected and maintained a dam across the Osage River causing deposits of silt in the vicinity of Warsaw, which deposits of silt caused Prairie Hollow Creek to back up and overflow plaintiff's crops. This is tort in the nature of trespass."

Since no point is made as to the amount of the verdict, evidence touching the value of crops destroyed will not be detailed.

Defendant's dam was constructed during the years 1929-31 and is approximately 2543 feet long, 148 feet high from bed rock and about 60 feet wide at the base and tapers to a width of 20 feet at the top and extends completely across the Osage River. The lake was filled during the month of October, 1931, and when at full stage the water extended more than 130 miles westward above the dam. Defendant had never acquired an easement to flood any part of plaintiff's

land, which was upstream above the normal headwaters of the lake. His farm is located on what is called Prairie Hollow Creek, which runs diagonally across his land from the south to the northwest, with bottom land on either side. It flows into Whig Creek about a quarter of a mile west of his farm, and Whig Creek flows into the Pomme de Terre River about a quarter of a mile further, and the Pomme de Terre flows into the Osage River about 4½ miles below that point. However, when the lake is at full reservoir the headwaters extend up into the Pomme de Terre River above the junction of the Osage and the Pomme de Terre. The village of Fairfield is located on the Pomme de Terre about 2 miles from the junction of the Osage and Pomme de Terre, and about 130 miles from the dam. We mention this village and its location because it is referred to many times in the evidence.

In May, 1943, a freshet, headwater, came down Prairie Hollow Creek and overflowed its banks for about 2 hours, but did little, if any, damage to plaintiff's crops. When 3 or 4 days later backwater came up Prairie Hollow Creek from Whig Creek and the Pomme de Terre and overflowed all of plaintiff's crops to a depth of from 6 inches to 6 or more feet, and remained on the land for 10 or 12 days, destroying his crops. There were logs, trees, corn stalks, mud and other debris caught in his fences, mashing them down and leaning them *upstream*. There had been some rain "off and on" for 4 or 5 days before the backwater came in. There was evidence by witnesses who had lived in that community many years to the effect that the backwater had never come into Prairie Hollow Creek prior to this time; that the backwater had never come into Prairie Hollow Creek prior to this time; that the backwater in the Osage and Pomme de Terre was 8 or 10 feet higher than it had ever been during the past 50 years. A witness who was at the *dam sight* at the crest of the flood testified that the level of the lake was 7 to 7½ feet above full reservoir and continued so for 8 or 9 days; that the elevation at *full reservoir* is 660 feet above sea level; and that ordinarily the difference between the height of the water above the dam and below it is 70 feet, but during this flood the difference was only 50 or 60 feet.

Plaintiff's evidence is to the effect that where the running water of the smaller streams flows into the placid or deadwaters of the lake, there are deposits of silt and debris. This deposit varies in depth according to its location. Beginning at the town of Warsaw, which appears to be at about the headwaters of the lake at *low water stage,* the deposits are of varying depth up to the village of Fairfield on the Pomme de Terre. These deposits of silt were not present before the dam was constructed, but have formed and increased in depth since such construction. Along the water front at Warsaw the deposits were from 6 inches to as much as 30 feet deep. Witness Benberg, testifying for plaintiff as an engineering expert, stated that he had observed the condition at Warsaw on two occasions prior to the trial

and that "the silting I observed at Warsaw was such that it in reality formed a dam across the river there and, of course, the dam retards the flow of water and, furthermore, it's wide and narrow; therefore, you would have shallow depths whenever the water runs over it and the velocity of water is less in shallow water than it is in deep water."

Other witnesses testified that silting had occurred along the banks and bed of the Osage and Pomme de Terre Rivers from Warsaw to the village of Fairfield. One described the condition at the junction of the two rivers as being about the same as at Warsaw—but not quite as bad. Another testified that about one mile up the Pomme de Terre "there are two sloughs which had filled up approximately 10 feet since the first filling of the lake. . . . And left (in) the Pomme de Terre up as far as Fairfield places that used to be gravel bars and ripple shoals, as we call them, covered with silt, mud, old logs that drift in with the back water and stop. . . . Q. Making a new bank, in other words? A. That is right."

Many witnesses, who had lived in the vicinity of Warsaw and Fairfield for many years, testified to the accumulation of silt and debris in that general territory since the construction of the dam, but we deem it unnecessary to detail the evidence of each witness, as it is all of the same import. Since an attack is made on the competency of certain evidence given by witness Ferguson and against all the evidence of witness Benberg, we shall recite their testimony more in detail.

Mr. Ferguson testified that he was 61 years of age and had lived on the Osage River about 4 miles northwest of Warsaw all of his life; was familiar with the various floods which had occurred during his lifetime, and particularly the high floods of 1895, 1926-'29 and '35; that the flood of 1943 was "at least 8 feet higher" than any other flood he had seen during his life; that he had observed the silting and filling in along the Osage and Pomme de Terre Rivers from Warsaw to Fairfield, since the dam was constructed, and that there were places along his farm which had filled in with mud and silt to a depth of 8 or 10 feet. After detailing his familiarity with the Osage River, prior and subsequent to the construction of the dam, and the changes that had occurred, this question was asked: Q. Now, taking into consideration the floods of the past, the condition of the stream bed and the rain falls, as you recall them and remember them, in your opinion did the dam in the Osage River at Bagnell cause or contribute to the elevation that this flood rose in 1943?" Objection was made, and the court stated: "I think, Mr. Brady, the question should embody any observation or facts he may know of the silt and debris." The question was then amended to include the following: "And take into consideration the accumulation of silt or mud or any other obstruction that had accumulated in the stream bed and tributaries since 1931?" Objections were renewed and overruled and the witness

answered, "I claim that it did. Q. That is, you believe it did? A. Yes, sir."

Defendant urges the admission of the quoted testimony as erroneous because the witness was a non-expert and was not qualified to express an opinion and a conclusion on the question of proximate causation, which was the ultimate fact in issue to be decided by the jury. Plaintiff concedes that the general rule is that a non-expert witness must state facts and not give his opinion or conclusion, but contends that there are exceptions to this rule, and that witness Ferguson's testimony comes within the exceptions.

After carefully examining a multitude of cases cited by the parties, and text books on the subject, we conclude the witness should not have been permitted to give his opinion of the *cause* of the excessive high water. In the first place, the witness testified that he did not know the amount of rainfall within the Osage basin immediately before and during the flood stage, although he had observed the amount of rainfall "at his place;" and did not know just where the headwaters of the lake were at full reservoir with respect to plaintiff's land. But, aside from this, we do not believe the evidence is admissible under any recognized exception to the general rule relative to non-expert witnesses, as argued by plaintiff. He contends, in effect, that a non-expert witness may state a conclusion of fact which is really not a conclusion but a shorthand rendering of the physical facts which the witness has observed but is unable to convey accurately to the jury except in the form of a conclusion or opinion. There is such an exception to the general rule which is applied by the courts in some instances, where the conclusion of the witness falls in the class termed "conclusion of fact." For a collection of many Missouri decisions on the subject, see Fulton v. Metropolitan Street Railway Co., 125 Mo. App. 239. See, also, 22 C. J. (Evidence), pars. 613, 623; 32 C. J. S. (Evidence), par. 459, et seq.

Plaintiff relies on four Missouri decisions and many others from sister states. The Missouri cases are, Fulton v. Metropolitan St. Rwy. Co., supra; McPherson v. Railroad, 97 Mo. 253; Standley v. Railroad, 121 Mo. App. 537, and Owen v. Railroad, 109 Mo. App. 608.

The Fulton case was a suit to recover damages for personal injuries alleged to have been caused by the negligence of the defendant. A witness was permitted to testify whether the plaintiff appeared to be suffering after the accident and whether she was active after her injuries, and other similar questions relative to her state of health and appearance. In discussing an exception to the general rule against non-expert witnesses giving their opinion or conclusion, the court said (247):

"Opinions may be given by non-expert witnesses as to state of health, hearing or sight, or the ability of another to use his arms or legs naturally and whether such other is apparently suffering pain

or is in possession of his or her mental faculties or is intoxicated, excited, calm, angry or the like. . . ."

In the McPherson case a witness who "was a farmer of the immediate locality, having lived there all his life and within two or three hundred feet of said culvert," was allowed to state, on the basis of "sufficient opportunity for personal observation," that the culvert was not large enough to carry away the water that accumulated immediately behind the defendant's fill as a result of a freshet. In holding that the evidence was proper, the court said (256):

"Even if the question is to be regarded as calling for the opinion of the witness, and even if portions of the evidence as to the capacity and sufficiency of the culvert are to be regarded as containing his opinion on these subjects, the question and evidence was, we think, nevertheless admissible and receivable. The inquiry does not involve any unmixed question of science and skill, but was one on which the judgments of ordinary persons *having sufficient opportunity for personal observation,* and giving in their testimony the facts of their observation, might properly be received, for such comparison and weight as the jury might see fit to give them." (Italics ours.)

In the Standley case the defendant railroad put in a bridge across a creek, and in so doing threw into the creek bed large amounts of dirt and rock. The plaintiff sued for the flooding of his land "situated one-third of a mile northeast of said bridge." The court held that a farmer witness, who lived in the neighborhood, could testify *from his personal observation* that the acts of the railroad had left the channel of the creek so obstructed that it was not wide enough to furnish a discharge of the creek in ordinary high waters, and that the water on the upper side of the bridge was higher than on the lower side of the obstruction. A careful reading of this opinion shows that the court again was allowing a shorthand statement of facts *actually observed* by an eye witness.

In the Owen case the defendant railroad had built a new bridge across a stream running by plaintiff's farm and the negligence charged was that the bridge was built too low and that defendant left pilings standing in the stream, and wrecked freight cars were allowed to remain in the bed of the stream, causing the water to overflow his land. The court held that it was proper for "witnesses who had experienced floods at this point at times when there were no obstructions," to testify how much higher the obstructions caused the water to rise and how much longer it remained over the land.

We deem it unwise to lengthen this opinion by discussing each case cited from other states. But, speaking generally, the courts seem to permit a non-expert witness to give his conclusion of the cause of a certain alleged event, when the cause and the occurrences are within such a limited and restricted area that the witness has had opportunity to personally observe the occurrences upon which

he bases his conclusion but, for various reasons, cannot place the jury in possession of all the facts as clearly as he himself has seen and observed them. This principle is tersely stated by the court *en banc* in Scanlon v. Kansas City, 325 Mo. 125, 149, 28 S. W. (2d) 84, 95, where the court quoted approvingly from Greenleaf on Evidence that in practice opinions are receivable "from persons who have no special skill but have personally observed the matter in issue, and cannot adequately state or recite the data so fully and accurately as to put the jury in the witness's place and enable them equally well to draw the inference." See, also, Sullivan v. Union Electric Light and Power Co., et al., 331 Mo. 1065, 1081, 56 S. W. (2d) 97.

That is not the situation in this case. The dam, which is alleged to have caused the overflow, was located about 95 miles downstream from witness Ferguson's point of *observation*, and plaintiff's farm was located some 40 or 50 miles upstream from his point of *observation*; he did not know the amount of rainfall immediately before and during the flood stage in the Osage River basin, which covers several thousand square miles; he did not know the elevation or location of plaintiff's farm, or how far it was from the headwaters of the lake at full reservoir. To permit witness Ferguson to give the conclusion called for would, in our opinion, extend the exceptions to the general rule out of all proportion and get entirely away from the reasons underlying its origin.

The out-state cases relied on by plaintiff are: Hand v. Catawba Power Co., 73 S. E. 187; Galveston, etc., R. Co. v. Daniels, 9 Tex. Civ. App. 253, 28 S. W. 548, l. c. 550; Gulf, etc., R. Go. v. Richards, 83 Tex. 203, 18 S. W. 611; Taylor v. San Antonio R. Co., 36 Tex. Civ. App. 658, 83 S. W. 738, l. c. 746, col. 2.; S. W. Portland Cement Co. v. Kezer (Tex. Civ. App.), 174 S. W. 661; Hartford Co. Com'rs v. Wise, 71 Md. 43, 18 Atl. 31; Estes v. Chicago, etc., R. Co., 159 Ia. 666, 141 N. W. 49; Porter v. Pequonnoc Mfg. Co., 17 Conn. 249; Ry. Co. v. Haskell (Tex.), 23 S. W. 546; Etheridge v. Ry. Co. (Tex.), 39 S. W. 204; City of Austin v. Howard (Tex.), 158 S. W. (2d) 556; Ft. Worth, etc., R. Co. v. Kiel (Tex.), 185 S. W. (2d) 144; Noe v. C., B. and Q. R. Co. (Ia.), 41 N. W. 42; Madisonville, etc., R. R. Co. v. Renfro (Ky.), 127 S. W. 508, l. c. 510; McLeod v. Lee, 28 Pac. 124; Ry. Co. v. Ditch Co. (Col.), 35 Pac. 910; Cleveland, etc., R. Co. v. True (Ind.), 100 N. E. 22; St. L., etc., R. Co. v. Bradley, 54 Fed. 630; Covert v. Ry. Co. (W. Va.), 100 S. W. 854.

There is another reason why the opinion or conclusion of witness Ferguson was inadmissible. The only contested issue for the jury's determination was the *cause* of the overflow of plaintiff's land. The courts in this state hold that a non-expert witness may not give his opinion of the proximate causation. Illustrative of the principle involved is the opinion *en banc* in Landau v. Travelers Ins. Co., 315 Mo. 760, 768. There the very heart of the question to be determined

by the jury was whether insured intentionally jumped or accidentally fell from a car, and the court held it was improper for an eye witness to give it as his opinion that plaintiff fell from the car because the facts and circumstances of the fall had been detailed and the jury should draw its own conclusions from such facts and circumstances. Other cases to like effect are: Hughes v. Prudential Ins. Co., 179 S. W. (2d) 630; Schaeffer v. Northern Ins. Co., 177 S. W. (2d) 688; Butler v. Union Pac. R. Co., 236 Mo. App. 1134, 163 S. W. (2d) 100; Martin v. Conner, 233 Mo. App. 1024, 128 S. W. (2d) 309; Burg v. Wabash R. Co., 244 Mo. 76; Brands v. St. Louis Car Co., 213 Mo. 698; Cane Creek Coal Mining Co. v. Braden, 25 Ala. App. 256, 140 So. 143; St. Louis I. M. & S. R. Co. v. Yarborough, 56 Ark. 581, 20 S. W. 515; Northern California· Power Co. v. Waller, 174 Cal. 377, 163 Pac. 214; Kendrick v. Furman, 80 Neb. 797, 115 N. W. 541; McLeod v. Miller and Lux, 40 Nev. 447, 153 Pac. 566; Dekalb County v. Tennessee Electric and Power Co., 17 Tenn. App. 343, 67 S. W. (2d) 555.

For the above reasons, we hold witness Ferguson should not have been permitted to give his opinion of the cause of the excessive flood. The effect of such error will be discussed later.

Defendant also claims error in the admission of the testimony of witness Alfred Benberg as an expert, because he was not qualified by experience or training or knowledge of the facts to testify as an expert. Concerning his qualifications, Benberg testified that he was born, raised and educated in Denmark, was 46 years of age, and had received a Bachelor of Science degree and a degree in Civil Engineering at the Royal Technical College at Copenhagen, and had specialized in hydraulic engineering at Le Compete Technique, a branch of the University of Paris, France, and has practiced civil engineering since his graduation; that while he was in Denmark he designed a system for controlling tide waters of a stream emptying into the ocean, but had nothing to do with the actual construction of the system; that after coming to this country he designed and installed water mains in the streets of New York City for one year, and had designed and constructed plants for Standard Oil for five years, and had spent a year in Europe · where he designed and built some factories. He then returned to the United States and entered business for himself as a Consulting Engineer in Kansas City. In that capacity he built some manufacturing plants. He had never had any experience determining the flow and velocity of water in any navigable stream the size of the Osage River; but had determined such matters in streams 5, 10 or· 15 feet deep. Since his graduation from the University, he had continued to study text books and scientific articles on hydraulics, and particularly that branch of the subject pertaining to flood control and silting. He was licensed in Missouri as an architect but not as an engineer. For the purpose of testifying in this case he made two

trips to the Osage River near Warsaw and Fairfield, the territory here involved; he made no particular or scientific measurements, but did observe facts and conditions, about which he testified, and which will be later noted. He had attended this trial and heard the testimony of other witnesses pertaining to conditions existing in the Osage basin before and subsequent to the construction of the dam.

The fundamental part of Benberg's testimony is to the effect that the placing of a dam in or across a stream would cause the water to rise and become impounded and form "still or dead water;" that when running water comes in contact with *dead water* there will be a loss of velocity and if the running water carried silt a loss of velocity would cause settling of the silt at that point; that "the silt carried by the Osage and the other rivers would naturally settle when they got down into the placid waters in the lake above the dam. . . . The silting would take place at all points where the velocity would be so low, so the silt could not be carried in the suspension of the water." Under the fundamentals of engineering, with reference to silting, it makes no difference whether the stream is small or large. He described in detail the location and amount of silting he observed, beginning at Warsaw and extending upstream to Fairfield, which, of course, included the Osage River and some 2 or 3 miles up into the Pomme de Terre. Then the following testimony developed, to which defendant objects: "Q. Basing your answer on the degree of silting, as you observed it in the Osage and Pomme de Terre, I will ask you whether or not, in your opinion, that would retard the flow of water in that basin. . . . The stream above and its tributaries and *in the region of Fairfield*? A. It would. Q. It would retard the flow of water? A. Yes, sir. Q. Now, I wish you would explain your answer to the jury. Why you say that? A. The silting that I observed at Warsaw was such that it in reality formed a dam across the river there and, of course, the dam retards the flow of water and, furthermore, it's wide and narrow; therefore, you would have shallow depths whenever the water runs over it and the velocity of water is less in shallow water than it is in deep water. Q. Would that statement be true also in flood stage or any stage? A. There is no difference whether flood stage or whether its normal stage, only in that respect that the deeper the water, the faster it runs. Q. With reference to the principles of hydraulics, are they the same with reference to both small stream and large streams? A. There is no difference. We don't have one theory for a small stream and one for a large stream; the laws of hydraulics applies to a stream, whether that stream is two foot wide or two miles wide. . . . Q. Now above the points of silting, what effect would that silting have with reference to raising the level of the water? A. Well, the water would pile up behind that, the silt banks, as I saw them. Q. Now explain why you say that; . . . A. Well, in silting and the banks that the silting

has formed, just act as another dam. Q. And that causes what? A. That causes the water to be impounded above that dam. Q. And pile up, as you say? A. Yes, sir.''

We think this witness was qualified to testify to the facts which he detailed. Some of the facts testified to are common knowledge, and others were based on what he actually observed. But, aside from this, the qualification of an expert to give an opinion on a proper subject is largely in the discretion of the trial court, although the question whether the trial court abused its discretion is always reviewable by the appellate court. ''In order to qualify a witness to speak as an expert it is only necessary that the matter inquired of involved special knowledge or skill, and that he should satisfy the court that he is possessed of these qualities, either by actual experience or study.'' Ambruster v. Levitt Realty and Investment Co., 341 Mo. 364, 375, 107 S. W. (2d) 74; 32 C. J. S., Sec. 458(b), p. 99, where the authorities on this subject are collected.

The record in this case discloses that the trial court held, within strict limits, questions which should be asked and answered by this witness. We hold that no error was committed in permitting Benberg to testify to the facts given in the record.

With the opinion evidence of witness Ferguson eliminated, there is no d'rect and positive testimony in the record that defendant's dam caused plaintiff's land to be flooded. This raises the question whether the other competent evidence, together with all reasonable inferences to be drawn therefrom, is sufficient to make a submissible case.

Without again detailing the evidence, the salient features of plaintiff's case may be stated to be: Defendant owned and operated a large dam across the Osage River, which formed a large lake, known as the Lake of the Ozarks. This condition had existed since October, 1931; as a consequence of the formation of the lake, there accumulated large silt deposits at and near the points where flowing water from tributaries contacted the placid waters of the lake, which fact the defendant should have anticipated at the time the dam was constructed; that these silt deposits were not in the Osage prior to the erection of the dam; that at and near Warsaw there had accumulated deposits ranging in depth from a few inches to 8, 10, 12 and, in some places, 30 feet; that these deposits extended up the Osage River for several miles and up into the Pomme de Terre to a point at or near Fairfield; that plaintiff's farm was located about 3 miles beyond Fairfield on a tributary of the Pomme de Terre; that these silt deposits were of such depth and proportion that they were in effect another dam, which would retard the natural flow of the water and cause it to pile up or back up above such deposits; that in May, 1943, plaintiff's land was flooded by backwater; that at Warsaw and other points upstream, the flood waters were 8 feet higher than had ever been known by witnesses who were familiar with the Osage during the

past 60 years; that plaintiff's farm had never been flooded by *backwater* within the recollection of any of the witnesses; that there had been considerable rain in the Osage basin that spring; and that about the middle of May there was a freshet which caused Prairie Hollow Creek to temporarily leave its banks and flood a small part of plaintiff's land, but within two hours this had subsided and 3 or 4 days later the backwater from the Pomme de Terre came up into Prairie Hollow Creek and flooded plaintiff's farm and remained on the land from 10 to 12 days.

Defendant first contends that plaintiff failed to make a case for the jury because there was no evidence that the crest of the 1943 flood reached an elevation on defendant's dam, which was higher than the elevation of plaintiff's land. This is not the theory on which the case was tried and we need not discuss that contention, except to observe that if defendant desired to know more specifically the manner by which the dam caused the overflow, then it should have filed a motion requesting that the petition be more specific and particular in its allegations.

Defendant next contends that, upon the theory that the dam caused silting deposits which, in turn, caused water to back up on plaintiff's land, plaintiff failed to make a submissible case because the evidence on proximate causation is speculative and conjectural. On this point it argues that "there was no proof as to what extent the silting interferred with the flow of the Osage and Pomme de Terre Rivers, because there was no evidence as to the difference in the cross sections (the area) of the valley or flood plain of the Osage or Pomme de Terre Rivers at any point before the dam was built and on or about May, 1943, after the silt had formed. There was no evidence as to how far the silt deposits were downstream from plaintiff's land so that it could be ascertained with any degree of certainty whether the silt deposits caused the water to back up on the plaintiff's land." We cannot agree with the last sentence quoted, because the plat of the Lake of the Ozarks, which was introduced and is on file here, shows that the headwaters of the lake at full reservoir extends beyond the point where Whig Creek flows into the Pomme de Terre, and other evidence in the record is to the effect that Prairie Hollow Creek flows into Whig Creek about one-fourth of a mile from plaintiff's flooded land, and that Whig Creek flows into the Pomme de Terre one-fourth of a mile from that point, so that it would appear that the headwaters of the lake, at full reservoir, is within about one-half mile of plaintiff's land.

With reference to the other contention that "there was no proof as to what extent the silting interferred with the flow of the Osage and Pomme de Terre Rivers, . . ." it may be conceded there was no scientific or technical evidence as to the exact elevation the silt deposits would cause the water to rise, but there is other evidence

in the record from which we think the jury could infer that the silt deposits were of such height and extent that they retarded the flow of the water to such an extent that it *backed* onto plaintiff's land doing the damage complained of. Plaintiff is entitled to all reasonable inferences which may be drawn from all the evidence when the question of whether he made a submissible case is raised by motion.

Defendant relies heavily on the case of Evans v. Massman Const. Co., 343 Mo. 632, 122 S. W. (2d) 924. That case was based on alleged negligence on the part of the defendant in the construction of a certain dyke in the Missouri River, which caused a break in a levee 2.87 miles above the dyke, causing the flooding of plaintiff's land. The facts are set out in great detail in the opinion and we shall not undertake to review them, but the court held that before the plaintiff could recover his evidence must prove three things: (1) That he was injured; (2) that defendant was negligent; (3) that defendant's negligence was the proximate cause of the injury. The dyke was constructed according to the plans and specifications of the United States Government, and under the specific facts in that case the court held that plaintiff failed to prove any negligence in the *construction* of the dyke. The court also held that the evidence failed to prove that the construction of the dyke was the proximate cause of the break in the levee. There are many facts in that case which are not present in the instant case, and there are facts in this case which are not present in that case. The court emphasized the fact that in the immediate vicinity of the break in the levee there were 25 dykes other than the one claimed to have been negligently constructed, and discusses the effect of those dykes in retarding the flow of the river. In the Evans case the court refers to the case of Arnold v. Hoffman and Son Milling Co. (Kan.), 143 Pac. 413, 414, wherein it appeared that the defendant had constructed a dam which impounded water in a certain stream; and that plaintiff's land was about 1¾ miles above the dam; then a railroad company constructed a bridge across the stream about one mile above the dam which obstructed the flow of the water in the stream. The Kansas Supreme Court held that plaintiff's evidence made a submissible issue as against the railroad company, but failed to establish the fact that the construction of the dam was the proximate cause of the flooding of his land. Of course if the evidence in the present case had disclosed an intervening cause brought about by a third person, those cases would be much stronger authority supporting defendant's contention. But in the instant case there is no such intervening cause, and the evidence of the amount of rain fall within the Osage basin is insufficient to sustain defendant's contention that the flooding was an Act of God.

There are other cases cited by the defendant which hold that the evidence is insufficient to prove proximate cause. Brown v. R. R. Co., 195 Fed. 1007; Morris in Receivers, etc., 65 Fed. 584; Treichel v.

R. R., 80 Minn. 96, 82 N. W. 1110; and plaintiff has cited many cases where the courts have held the evidence is sufficient to support the burden of proximate cause. But a review of such cases would serve no useful purpose because each case must largely depend upon its own facts to meet the test of the general principle of law that before a plaintiff can recover in cases of this kind his evidence must be sufficient to bear the burden of proximate causation. We think the evidence in this case does meet that burden, and the trial court did not commit error in overruling defendant's motion for a directed verdict.

Defendant's last contention is that the court erred in giving plaintiff's instruction No. A. This instruction in substance directed the jury to find for the plaintiff if they found during and prior to the month of May, 1943, defendant maintained and operated a dam across the Osage River; and that in May Whig Creek and Pomme de Terre became flooded to the extent that plaintiff's land was flooded, and that under all the conditions then and there existing plaintiff's land would not have been flooded had it not been for the maintenance and operation of the dam by the defendant; and that the flooding of plaintiff's land directly and proximately resulted from the construction, maintenance and operation of the dam; and that plaintiff's crops were destroyed as a result thereof, etc.

Defendant renews its contention that this instruction should not have been given because there is no evidence to support it; this on the theory that there was no evidence that the water reached a point on defendant's dam higher in elevation than plaintiff's land. We have disposed of that contention on the ground that this was not the theory upon which plaintiff tried his case. But defendant argues that because the instruction did not mention the evidence concerning the silt deposits, that therefore plaintiff must have and did submit his case on the sole theory that the water rose to an elevation on the defendant's dam which was higher than the elevation of the plaintiff's land. There is no merit in this contention. Error is not assigned because instruction A failed to mention or submit the case on the evidence of silting.

There remains the question whether the judgment should be reversed and the cause remanded, because the court erred in admitting in evidence certain testimony by witness Ferguson. The new Code of Civil Procedure, Laws 1943, p. 385, Sec. 140(b), provides. "No Appellate Court shall reverse any judgment, unless it believes that error was committed by the trial court against the appellant, *and materially affecting the merits of the action.*" We do not believe the one answer of witness Ferguson, which was improperly admitted, materially affected the merits of the action because there was so much undisputed and uncontradicted evidence not objected to, which sustained and explained the *cause* of the flood, that we are convinced

no prejudice resulted. In fact, defendant does not urge the reversal of the judgment because that evidence was prejudicial. Its contention is that without such evidence, no submissible case was made. We have held to the contrary. Considering all the evidence, we are unwilling to remand the cause for another trial because of this one error.

It follows that the judgment should be affirmed. All concur.