No. 76,948

MARK MOORE, JOANNE MOORE, RICHARD CRONEY, GENEVA CRONEY, ELIZABETH DICKEN, CINDY PERRY, FAY FISHER, LLOYD A. MOURNING, NANCY MOURNING, ROBERT JONES, LUCILLE JONES, RICK LANGEROT, IRENE LANGEROT, LARRY WATSON, DIANA WATSON, DONALD MUNDT, DEBORAH SCHIELL, JAMES DUSTIN, JAMES RHODES, THERESA RHODES, MELODY A. STREET, VIRGINIA CRILE, and ST. JOSEPH MEDICAL CENTER, *Appellants*, v. ASSOCIATED MATERIAL AND SUPPLY COMPANY, INC., *Appellee.*

(948 P.2d 652)

Opinion filed November 7, 1997.

*Corlin J. Pratt*, of Grace, Unruh & Pratt, of Wichita, argued the cause, and *Brian G. Grace* and *Terry L. Unruh*, of the same firm, were on the briefs for appellants.

*David J. Morgan*, of Hershberger, Patterson, Jones, & Roth, L.C., of Wichita, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This is an appeal by a group of homeowners (Homeowners) who have sued the operator of a sand pit adjacent to their property, Associated Material & Supply Company, Inc., (Associated), for damages alleged to have been caused during floods in May and July 1993. Homeowners claimed a pile of overburden constructed by Associated diverted floodwater onto their property.

The trial court granted summary judgment to Associated on the ground Homeowners had failed to obtain and identify an expert witness to establish causation.

*Factual statement*

The result we reach on the principal issues to this appeal is primarily guided by our standards of review. As such, our factual statement is based on the various affidavits, depositions, documents, and exhibits in the record and the uncontroverted facts that have evidentiary support.

Homeowners own property in the Holiday Lakes and Holiday Acres subdivisions in Mulvane, Kansas. Many of the homes were built prior to 1975. Their properties lie directly west of the Arkan-

sas River, which flows from north to south past their homes. Their properties lie in the flood plain of the river, and many of the houses have been raised to avoid high water. Old Highway 53 runs east and west just north of their properties, and an access road, Estafan Road, runs north and south along the west side of Homeowners' neighborhood. A wooded area lies to the west of Estafan Road.

Associated purchased farmland to the immediate west of Homeowners in 1980 with the intention of establishing a sand pit operation. In April 1983, Associated obtained a special use permit for the operation from the Mulvane Planning Commission and the Mulvane City Council, but never obtained any levee permit from the Kansas Board of Agriculture, Division of Water Resources (DWR) until subsequent to the July 1993 flood. Homeowners, through counsel, expressed concerns to Associated in 1984 when overburden from the sand pit operations began piling up along the east side of Associated property. Homeowners' attorney, Robert Kaplin, warned Associated of potential flooding problems, but discussions resulted in no positive action.

From 1984 through 1993, Associated piled dirt along the eastern edge of its property immediately west of the wooded area west of Homeowners' property, forming an obstruction to the flow of water. The overburden pile ran from near the northern boundary of Associated's property to the southern end of the sand pit lake. By 1993, the pile formed a levee 5 to 10 feet in height, nearly 100 feet wide in places, and extending approximately one quarter of a mile.

Homeowners had experienced flooding in 1944, 1951, 1957, 1961, 1962, 1965, 1973, 1974, 1979, 1981, 1987, 1989, 1993, and 1995. The 1993 floods in May and July were the highest of record, although the 1979 flood during the first part of November was nearly as high. Gauge records on the Arkansas River at the Derby station (about 7 miles north of Homeowners' properties) showed a discharge of 55,200 cubic feet per second, 94% of the FEMA 100-year frequency flood in 1979. Records of the May and July 1993 floods reported the discharge at 95% and 98%. The U.S. Corps of Engineers, using a base discharge of 76,000 cubic feet per second, reported yields of 68%, 69%, and 71% of a 100-year

flood for the flooding of 1979, May 1993, and July 1993, respectively.

In 1979, Homeowners sustained no flood damages; however, in 1993 major damage was sustained. Homeowners assert that the only topographical change during the intervening years was the addition of the levee. Associated pointed out that landowners to the north and east had built a dike along the eastern edge of their properties, but the effect of this structure is unclear.

During the May 1993 flood, water began flowing from the north over Highway 53 north of Homeowners' properties and through the northeast corner of Associated's property. On May 9, 1993, Associated employees piled dirt into an entrance road at that corner to slow down the water, prevent the road from washing out, and prevent water from entering the property. This dirt bridged a gap between the levee and higher ground to the north. The road, however, did eventually wash out, and some of Associated's property was damaged.

On July 15, 1993, when the area was starting to flood again, Associated employee Harry McWithey began building onto the levee near the entrance of the sand pit at the northeast corner. Also on that date, Associated's general manager, Marvin Bedigrew, created a dike at the south end of the levee that was 50 to 75 feet long and 3 feet high. The dike was intended to block water that was backing up from the south.

The following day, July 16, 1993, water came over the top of the dike running along the southerly edge of the property, and Bedigrew built another dike further north which was as high as the levee and about 100 feet long. Water came over the top of this dike in the afternoon of the 16th. Water never came over the top of the levee.

On either the morning of the 15th or the 16th, one of the Homeowners, Lisa McDonald, called Nadine Stannard, owner of Associated, and asked her to order her employees not to build a dike at the sand pit entrance. Stannard replied, "My business is my responsibility, not the concern of the residents of the area." McDonald told Stannard that the residents would force her to take down the levee. Around noon of that day, the Sumner County

Sheriff arrived at the site and ordered Associated to shorten the north end of the levee. A 20- to 40-foot hole was cut at the north end of the levee.

On July 20, 1993, two additional cuts were made in the levee to allow water to escape. These cuts were made at the request of the DWR. Associated's engineer, Michael Berry, testified the DWR believed breaching the levee would make the water go down in the residential area to the east.

After the July 20, 1993, cuts were made, Bedigrew noticed water flowing through the cuts from out of Homeowners' neighborhood. Residents of the neighborhood who are not plaintiffs noticed holes in the levees and dikes and testified that the water line dropped considerably when the north hole was made. Plaintiff Melody Street testified that when the cuts were made, the direction of the water suddenly changed, and the water quickly went down, leaving fish jumping on Estafan Road. Plaintiff Mark Moore observed that the breaches made in the levee did not even go to the ground level.

On July 15, 1993, Fred Foshag, an inspector from the DWR, arrived to investigate the flooding. Foshag made a number of observations of the impact of the levee during a 2-day on-site inspection. His field report stated:

"[M]y observations of the flow from the river and through the development confirmed the levee obstructs the flow and appears to aggravate flooding. It appeared that the southwest flow splits at the levee near the road in the center of the development with a portion flowing north. Floodwater then fills the sand pits before continuing to the south and west."

Foshag also indicated:

"[I]t was noted that they could flood with or without the sand plant's levee. It was also noted that it appeared that the sand plant could have a levee approved, but it appeared that the existing structure may have to be modified to be acceptable and not make flooding any worse than if it was not there."

Foshag again visited the site on July 21, 1993, and observed: "[F]loodwater flowing through the development was encountering the levee, and most was being diverted south. Some was still being forced around the north end, and some water was flowing west through the northern-most cut."

Associated was informed by Foshag that its levee needed a permit, and it quickly began the application process. The DWR eventually granted the permit; however, the permit did not allow the northern or southern wings running west that had been added to the levee during the floods. The DWR's assessment in granting the permit only evaluated the impact of the levee on the overall flood plain to ensure that it did not raise the water level of a 100-year flood more than 1 foot, yet the DWR did have some concerns regarding local drainage problems. The permit does not authorize any injury to private property.

In September 1994, Homeowners sued Associated for damages to their property from the 1993 floods, alleging the levee was the proximate cause of their damages. Homeowners also requested injunctive relief for the removal or modification of the levee.

In July 1995, Homeowners moved to amend their pleading to include a claim for punitive damages. Homeowners claimed that Associated acted willfully or wantonly because it proceeded to construct and make additions to its levee with knowledge of the danger to Homeowners' properties. At a hearing on this motion, the trial court ruled there was no showing that Associated had knowledge that its levee would cause substantial harm to anyone else, and Homeowners' request to add a claim of punitive damages was denied.

The trial was scheduled for October 10, 1995. Associated moved for summary judgment on September 21, and its appendix in support of the motion was filed 3 days later. A hearing was scheduled for October 3, 1995. Although not required to file a response by this time, Homeowners did so the day prior to the hearing.

After the hearing, the trial court concluded Homeowners had not set forth sufficient evidence from their lay witnesses to establish causation. The trial court ruled that "plaintiffs had listed no expert witness and (as of the time of the filing of the motion for summary judgment) have provided no expert reports."

The court went on to decide: "Where dynamics of floodwaters are involved, expert testimony is required to bridge the gap between these observations and an opinion on causation." The court relied upon *Johnson v. Board of Pratt County Comm'rs*, 259 Kan.

305, 913 P.2d 119 (1996), and *Kemna v. Kansas Dept. of Transportation*, 19 Kan. App. 2d 846, 877 P.2d 462 (1994), and indicated that in both of these cases, the plaintiffs had expert witnesses to prove causation.

The court further rejected Homeowners' flood comparison data to prove causation, declaring the conditions of the different floods to be dissimilar and pointing out that Homeowners had no expert to lay the requisite foundation. The court also stated that Foshag's report had been withheld and refused to allow him to testify as Homeowners' expert.

Homeowners were permitted to file a motion for reconsideration, which was subsequently denied. Homeowners' appeal was transferred to us, pursuant to K.S.A. 20-3018(c).

*Issues raised*

In appealing the grant of summary judgment and the refusal to allow a claim of punitive damages, Homeowners raise the following four issues: (1) Did the trial court improperly hold that Homeowners could prove damage causation only through expert testimony? (2) Was it improper for Associated's experts to testify to conclusions not set forth in their reports? (3) Did the trial court improperly rule that Fred Foshag would not be allowed to give testimony regarding his observations and opinions? and (4) Did the trial court erroneously deny Homeowners' motion to amend their pleadings to claim punitive damages?

*Summary judgment—standard of review*

The underlying basis for our decision is grounded in our scope of review of grants of summary judgment, which is set forth in *Seabourn v. Coronado Area Council, B.S.A.*, 257 Kan. 178, 188-89, 891 P.2d 385 (1995):

" 'A motion for summary judgment [under the provisions of K.S.A. 60-256(c)] is to be sustained only where the record conclusively shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In considering such a motion the movant's adversary is entitled to the benefit of all reasonable inferences and doubts that may be drawn from the facts under consideration. Where the facts presented in the motion are subject to conflicting interpretations or reasonable persons might differ as to their signifi-

cance, summary judgment is improper. It is only when it can be said that reasonable persons could reach but one conclusion from the same evidence that an issue may be decided as one of law. Summary judgment should never be granted merely because the court may believe movant will prevail if the action is tried on the merits.' [Citation omitted.]

"When the issue on appeal is whether the trial court correctly granted a summary judgment, an appellate court should read the record in the light most favorable to the party against whom summary judgment was entered. It should take such party's allegations as true, and it should give that party the benefit of the doubt when its assertions conflict with those of the movant. Factual inferences tending to show triable issues must be considered in the light most favorable to the existence of those issues. If there is a reasonable doubt as to the existence of fact, a motion for summary judgment will not lie. Moreover, pleadings and documentary evidence must be given a liberal construction in favor of the party against whom the motion is directed."

See *McGee v. Chalfant*, 248 Kan. 434, 437, 806 P.2d 980 (1991); *Patterson v. Brouhard*, 246 Kan. 700, 702-03, 792 P.2d 983 (1990).

*Did the trial court improperly hold that Homeowners could prove damage causation only through expert testimony?*

Associated argued in its motion for summary judgment that where the existence of proximate cause is not apparent to the average layman from common knowledge, expert testimony is required to establish causation, citing *McKee v. City of Pleasanton*, 242 Kan. 649, 750 P.2d 1007 (1988), and *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 756 P.2d 416 (1988). The decisions in these cases do not support such a broad statement. The holding of *McKee* is that "[a]rchitectural standards and practices are, in most instances, sufficiently technical to require the use of expert testimony to establish negligence or lack of reasonable care on the part of an architect." 242 Kan. 649, Syl. ¶ 3. *Bacon* is comparable in its holding relating to a medical malpractice case and similarly states: "Except where the lack of reasonable care or the existence of proximate cause is apparent to the average layman from common knowledge or experience, expert testimony is required in medical malpractice cases to establish the accepted standard of care and to prove causation." 243 Kan. 303, Syl. ¶ 2. Clearly, both cases only stand for the proposition that when plaintiffs are attempting to establish negligence based upon a departure from the reasonable standard of

care in a particular profession, expert testimony is required to establish such a departure.

When comparing the medical or architectural malpractice cases to the present case in its motion for summary judgment, Associated repeatedly asserted that negligence "includes causation." However, negligence in this sense is a breach of a duty of care. Obviously, to recover in an action for negligence, causation and damages must also be proven. However, it is incorrect to state that a finding of negligence includes causation, as a person may be negligent but fail to cause any damages, in which case the negligence is not actionable. *Durflinger v. Artiles*, 234 Kan. 484, 488, 673 P.2d 86 (1983), *disapproved on other grounds Boulanger v. Pol*, 258 Kan. 289, 900 P.2d 823 (1995). Associated's reliance upon *McKee* and *Bacon* is misplaced.

Holdings of an expert testimony requirement outside the area of professional liability, where breach of a standard of care must be proven, are not easily found. We recently addressed a similar issue in *Sterba v. Jay*, 249 Kan. 270, 283, 816 P.2d 379 (1991), a motor vehicle/pedestrian accident case where the Manual on Uniform Traffic Control Devices was used to establish a standard of care. The *Sterba* court stated: "The basis for the admission of expert testimony is necessity arising out of the particular circumstances of the case. Where the normal experience and qualifications of jurors permit them to draw proper conclusions from given facts and circumstances, expert conclusions or opinions are not necessary." 249 Kan. at 283. We concluded in *Sterba* that the jury did not need the assistance of an expert to evaluate whether a duty clearly defined in the manual had been breached.

Many of the cases discussing expert testimony deal with a trial court's admission or refusal to admit expert testimony into evidence. See, *e.g.*, *Simon v. Simon*, 260 Kan. 731, 735, 924 P.2d 1255 (1996); *Falls v. Scott*, 249 Kan. 54, 63, 815 P.2d 1104 (1991). The evidentiary issue of whether the trial court abused its discretion in refusing to admit expert testimony is a different inquiry and should be distinguished from the issue of whether a defendant is entitled to summary judgment if a plaintiff fails to provide adequate expert

testimony, where considerable direct evidence bears upon the precise issue to be proven.

Although expert witnesses may be permitted in some cases to testify on the basis of necessity, this does not necessarily mean that an expert would be required. In considering the necessity for proving matters through expert testimony, 31A Am. Jur. 2d, Expert and Opinion Evidence § 40, p. 49 states:

> "While the testimony of witnesses having specialized education and training, or special experience and knowledge, is often admitted into evidence on the ground of necessity, a party is not necessarily required to resort to expert opinion testimony merely because the case involves matters of science, special skill, special learning, knowledge, or experience which may be difficult for jurors to comprehend."

Additionally, in discussing whether a nonexpert may express an opinion on causation, 31A Am. Jur. 2d, Expert and Opinion Evidence § 344, pp. 344-45 reports:

> "However, where a nonexpert witness is particularly acquainted with the matter to which the cause of an occurrence or condition relates, and that matter cannot be fully reproduced and made intelligible to the jury except by the expression of an opinion interpreting the impression made on the mind of the witness, then such an opinion is admissible, provided the witness knows the facts personally and first testifies to the facts on which the opinion is based."

Many of the cases Associated has claimed establish that expert testimony is required to prove causation in flood damage cases merely hold that a nonexpert may not state an opinion, not that a jury cannot arrive at a decision in a flood case based solely upon nonexpert testimony, with no expert opinions. This is again different from holding that a nonexpert's testimony may not be used to prove causation. We briefly address several of these cases Associated has cited.

The court in *Grace v. Union Electric Co.*, 239 Mo. App. 1210, 200 S.W.2d 364 (1947), struck the opinion of a nonexpert, holding that the exception to the rule barring nonexpert opinions, where nonexperts can give an opinion when they have personally observed the matter and cannot adequately recite the data to put the jury in an equal place with the observer, did not apply. This was because a dam, alleged to have caused the overflow, was 95 miles from the

point of observation, and the witness made the observations 40 or 50 miles downstream from the plaintiff's farm. It is significant that after omitting the improper expert opinion, the *Grace* court, despite the lack of direct evidence of causation, concluded that the jury could have inferred from the evidence presented that the dam did cause water to back onto plaintiff's property. The court declared: "Plaintiff is entitled to all reasonable inferences which may be drawn from all the evidence when the question of whether he made a submissible case is raised by motion." 239 Mo. App. 1225.

*Jones v. Railway Co.*, 67 S.C. 181, 45 S.E. 188 (1903), reached a similar conclusion regarding the propriety of a nonexpert giving an opinion. It held it was proper to exclude the opinion of a witness who had no special knowledge of the effect of obstructions upon waters and also lacked familiarity with the river at the bridge, although the witness was permitted to testify regarding his own observations. The *Jones* court affirmed a judgment in favor of the plaintiffs, which was rendered despite the lack of expert testimony. *Cane Creek Coal Mining Co. v. Braden*, 25 Ala. App. 256, 144 So. 143 (1932), similarly decided that nonexperts could testify as to their observations but not give opinions, which were the province of the jury to determine. This case also affirmed the judgment for the plaintiff. *Wibaux Realty Co. v. Northern Pac. Ry. Co.*, 101 Mont. 126, 54 P.2d 1175 (1935), held that nonexperts are restricted to reciting facts and must leave the drawing of conclusions to the jury. *Southern Indiana Power Co. v. Miller*, 185 Ind. 35, 111 N.E. 925 (1916), indicated that it was error to allow a witness to offer an opinion when the witness was not qualified and the jury was capable of forming its own opinion from the facts.

In *Meeker v. City of Clinton*, 259 N.W.2d 822 (Iowa 1977), the court rejected the opinions of two nonexperts on the grounds they had not observed the flood they sought to testify about. The implication is that their testimony would have been admissible and material to causation had they actually observed the flood's alleged cause. Again, this is distinguishable from the proposition that expert testimony is required to establish causation.

*G. C. & S. F. Ry. Co. v. Hepner*, 83 Tex. 136, 18 S.W. 441 (1892), held that witnesses who were not sufficiently knowledgeable about

a river could not give an opinion as to the cause of an overflow. The court distinguished this case from one where a plaintiff was permitted to establish the cause of an overflow through several witnesses who had lived for many years along the river and were familiar with the usual rainfall.

Two more cases, *Page et al., Exrs., Aplnts., v. Pittsburgh*, 313 Pa. 211, 169 A. 104 (1933), and *O. & M. Ry. Co. v. Webb*, 142 Ill. 404, 32 N.E. 527 (1892), simply decided it was not error to allow an expert to testify.

Turning to Kansas cases, in *Ball v. Hardesty*, 38 Kan. 540, 16 Pac. 808 (1888), our court determined the defendant's expert testimony was competent to establish causation. There is an implication in this case that although the lay witnesses may have been able to testify that the water appeared to be backwater, a careful study and examination of the stream and its currents would be required to tell what caused the backwater. 38 Kan. at 542-43. However, this case does not answer the question of whether a court should sustain summary judgment if the plaintiffs failed to present expert testimony on causation.

Although *Ball* may provide limited support to Associated's position, a later Kansas case seems to clearly support the arguments of Homeowners. In *Arnold v. Milling Co.*, 93 Kan. 54, 143 Pac. 413 (1914), this court discussed a case where the plaintiff was attempting to recover flood damages from the owner of a dam, located one and three-quarters of a mile south of his property. However, a mile north of the dam, a railroad company had constructed a bridge. The trial court concluded there was evidence that the bridge had contributed to the flood, but none that the dam had. We affirmed, declaring:

"The fact that the water was from three to four feet higher above than below the bridge, and some of the witnesses placed it still higher, makes it clear that it was the obstruction at the bridge rather than the dam which caused the overflow of appellant's land. When a break was made in the obstruction at the bridge there was a perceptible lowering of the water, and the appellant had demonstrated by his proof that if the obstruction had been removed and the water permitted to flow on unimpeded to and over the dam his land would not have been flooded. The detention of the water at the dam may have resulted in flooding other lands between the dam and the bridge; but since the water held back by the dam was

about four feet lower than that above the railway obstruction, which was much lower than the water on appellant's land was deep, it is self-evident that the overflow on appellant's land was the result of the upper instead of the lower obstruction." 93 Kan. at 58-59.

The *Arnold* case provides strong support for the self-evident nature of Homeowners' testimony in this case. Evidence clearly exists to show that Associated's levee impeded the flow of water, that water flowed through the breaches in the levee, and that witnesses saw the water level on Homeowners' properties lower perceptively after the levee was breached, all of which appears to make it self-evident that the levee caused or contributed to the flooding. Where the causal nature of an action is self-evident, an expert is not required in order to submit a matter for decision to a jury, regardless of the existence of other complicating factors.

The authorities presented by Homeowners to support their assertion that expert testimony is not required to prove causation are more persuasive than those cited to the contrary. Homeowners first cite *County of Nueces v. Floyd*, 609 S.W.2d 271 (Tex. Civ. App. 1980), which the trial court distinguished on the grounds that in *Nueces* there were not multiple causes of the flooding as in the present case. The trial court did, however, quote the following statement from *Nueces*: "A lay person may testify as to conditions which he observed on the land itself, and may testify as to the path water takes in its flow, and may testify to other facts relating to flooding when such facts are visible to him." 609 S.W.2d at 276.

The *Nueces* court stated that photographs of the land, testimony from the county engineer as to velocity and volume changes, the testimony of four witnesses concerning the actual flow of the water, and the physical changes in the natural flow of the water amply supported the jury's verdict. This case clearly upholds the proposition that observations of lay witnesses can provide sufficient evidence of causation to allow the issue to go before the jury.

The court in *Kennedy v. Union Electric Co. of Missouri*, 358 Mo. 504, 216 S.W.2d 756 (1948), held that the cause of flooding could be established through circumstantial evidence. Particularly comparable with the Homeowners' case is the fact that the *Kennedy* court mentions that before the dam was built, the overflow had

never been high enough to touch the plaintiff's building. The court pointed out that the height of the water during this flood must have been due either to unprecedented rains or to conditions created by the dam, and held the plaintiffs made a jury question as to the latter theory. 358 Mo. at 517.

In *City of Austin v. Howard,* 158 S.W. 2d 556, 564 (Tex. Civ. App. 1942), the court stated:

"In the instant case the witness, who had observed several floods in this area, including that of 1938, and, as we understand it, had observed the flow of the waters as they struck the point of the levee, testified that, in his opinion, the levee caused the waters to flow across Howard's land. We doubt whether this even constituted an expression of opinion. Where a physical object in the flow of a stream and the action of the water as it reaches and passes it are clearly visible, the action of the object in diverting the flow of the water is a common observation and may be stated as a fact by a non-expert witness. It requires no expert skill to determine such fact."

Other cases cited by Homeowners also establish that witnesses who have long been familiar with the flooding patterns of an area are competent to form an opinion as to the cause of flooding. See *Madisonville, H. & E. R. Co. v. Renfro,* 127 S.W. 508, 510 (Ky. App. 1910) (Nonexpert witnesses were competent to show that the erection of an embankment and the failure to provide sufficient outlets for the water caused the damage to the crops.); *Standley v. Atchison, T. & S. F. Ry. Co.,* 121 Mo. App. 537, 97 S.W. 244 (1906) (Nonexpert witness, living in the vicinity of land overflowed by the construction of a railroad bridge over a stream, may testify that in his opinion the channel was not wide enough in ordinary high water, and that the water was nearly three feet higher above than below the bridge.); *Covert v. Railway Company,* 85 W. Va. 64, 66, 100 S.E. 854 (1919) (Witnesses who were residents of the village and acquainted with the conditions before and after the fill was made were competent to form and give opinions that the obstruction caused plaintiff's damages.).

The trial court relied upon *Johnson v. Board of Pratt County Comm'rs,* 259 Kan. 305, 913 P.2d 119 (1996), and *Kemna v. Kansas Dept. of Transportation,* 19 Kan. App. 2d 846, 877 P.2d 462 (1994), in its opinion, stating: "In both cases, the plaintiffs had an expert

witness to prove causation." Neither case, however, holds that expert testimony is required to establish causation; nor does either case indicate that the expert testimony actually established causation. Rather, the expert testimony appears to have been introduced to prove that a duty to the plaintiff had been breached.

Actually, our holding in *Johnson* further lends credence to Homeowners' action. In *Johnson*, we reversed the grant of summary judgment by the trial court, concluding that factual matters needed to be determined, and opined:

"We have stated that one who installs a bridge owes a duty not to change the channel or stream of the natural watercourse in ways that will cause substantial injury to downstream riparian owners. The trier of fact in the present case must determine what is to be considered the natural watercourse: the river, as altered by the old bridge, or the river, without regard to the presence of any bridge. As discussed previously, there remain material issues of fact as to whether the Johnsons have any prescriptive rights to the condition of the river as it existed with the old bridge. The trier of fact must then find whether the new bridge changed the channel or stream, causing substantial injury to the Johnsons' properties. If substantial injury is found, then the nature (permanent of temporary) and extent of the damages and relief (monetary, injunctive, or both) to which the Johnsons may be entitled must be determined." 259 Kan. at 330.

The *Johnson* case is commented on in a recent article in the Kansas Bar Journal by Robert W. Coykendall, entitled *Too Much of a Good Thing: Kansas Law on Unwanted Water*. Coykendall reviews historical development of this area of the law, and in a section discussing the "Tort Rules Governing Water Diversion," the author states:

"It would appear that virtually any change in the flow of water that causes substantial injury to another landowner could give rise to a tort claim. Most changes in land use that causes water to flow or remain upon the land of another involve some action that could be construed as gathering and diverting surface water, or projecting water upon another, or accumulating surface water and causing it to be cast in volume upon the land of others, or damming or altering of natural water flow, or accelerating the flow of water or increase the drainage of lands. Any of these acts, if it damages another's land likely would give rise to a tort claim." 66 J.K.B.A. 7, 28 (Sept. 1997).

In our case, there is considerable evidence concerning not only the piling of the overburden, but also the actual construction of

barriers by Associated during the course of both floods. As in *Johnson*, the trier of facts should properly consider such evidence and determine whether these structures caused the alleged damages to the property owners.

After our examination of all of the authorities cited, we are not prepared to approve a rule that expert testimony is required in this instance to prove causation. Sufficient evidence exists from Homeowners' observations, the testimony of Associated's own employees, and the observations and opinions of the DWR inspector to raise a factual question as to whether the overburden pile and dikes constructed by Associated affected the surface flow of the water. When we test such evidence as we are required to do under a request for summary judgment, we hold the evidence is sufficient to submit the issue to a jury.

Associated argues that notwithstanding the trial court's order concerning the necessity of expert testimony, the findings of uncontroverted facts provide an adequate basis for the court's ruling. However, Homeowners presented many additional facts in opposition to Associated's motion, though many of those facts were controverted. It is clear that these controverted facts remain to be determined, and the case should not be decided merely on the remaining uncontroverted facts.

Evidence proffered by Homeowners to establish damage causation includes the following facts: Associated's engineer, Michael Berry, understood the water was higher on one side of the levee than the other, which he said would mean the levee had the effect of stopping some water and had altered the surface flow of the water. Associated employee Bedigrew admitted seeing water flowing from the east to the west once the levee was breached. Bedigrew further acknowledged that the levee and its additions stopped the flow of water onto Associated's property. Associated employee Hollingshed admitted that if the dirt had not blocked the flow of water, it would have flowed west onto Associated's property. Nadine Stannard recognized that if the levee had not been in place, water would have flowed over Associated's property. Additionally, one of Associated's experts admitted that his studies did not indicate what the effect would have been on local flooding if the water

had been permitted to spread out across Associated's property as it had before the levee was built.

Homeowners also presented further evidence bearing on causation. The DWR issued reports and press releases stating that the levee appeared to obstruct the flow of the water. Foshag believed that the levee aggravated local flooding. There exists evidence that the DWR ordered breaches in the levee to relieve local flooding. Although the DWR estimated that the levee would not raise the level of the flood plain higher than one foot when it granted the levee permit, it had concerns that the levee could still have an impact on local drainage. Additionally, the DWR refused to authorize the levee as it existed during the floods of 1993.

Furthermore, numerous Homeowners indicated that the water flowed differently in 1993 than in prior floods. Evidence was presented that the water flowed back east rather than west, as it had previously done, because there was nowhere for the water to go. Several Homeowners observed the water recede significantly after breaches were made in the levee.

Homeowners are entitled to testify as to their own observations, and the jury is capable of sorting out whether their observations correspond to the time when cuts were made in Associated's levee. Contrary to the trial court's holding, these are exactly the type of factual determinations that juries are entitled to make.

Additional evidence establishing causation includes the data comparison of prior floods. This data need not have been presented by an expert, and a jury is capable of understanding it without an expert's interpretation. Discounting the flood comparison data on the grounds that other factors make the floods dissimilar is not justified on summary judgment. Evidence was in the record that conditions of the area had not changed significantly, with the exception of Associated's levee, and the possible differences mentioned by the court do not appear to be supported by the entire record. Although experts who are properly qualified certainly may opine about the dissimilarities in the conditions, these are all matters which are within the common knowledge and understanding of a juror.

Viewing all the evidence as we are required to do when summary judgment is contested, we hold that summary judgment was improper in this instance.

*Was it improper for Associated's experts to testify to conclusions not set forth in their reports?*

This issue is not significant in light of our previous discussion and holding. Additionally, this is not a case such as *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, 45, 661 P. 2d 348 (1983), where a later affidavit impeached prior testimony. Experts can issue supplemental reports up to the time of trial, and these are issues which the trial court has discretion to determine prior to and upon the trial of this case.

*Did the trial court improperly rule that Fred Foshag would not be allowed to give testimony regarding his observations and opinions?*

The trial court rejected the use of Foshag's testimony to prove causation, stating:

"To allow the plaintiffs to name an expert at this point would unfairly prejudice the defendant. . . . In fact, the plaintiffs withheld Foshag's report from the defendant under a claim of work product. The report was not provided until September 22, 1995, 18 days before trial was to commence. In their reply pursuant to the motion for punitive damages, plaintiffs state that '[t]he engineers for the DWR never expressed an opinion about whether the levee made a difference in the elevation of the floodwaters around the properties of the homeowners.' The plaintiffs should not be allowed to change their position on the eve of trial."

Homeowners contend that Foshag need not have been listed as an expert in order to express an admissible opinion as to causation and that admission of his opinions would not prejudice Associated. It is well established that the admission of evidence and the admissibility of expert testimony are matters within the broad discretion of the trial court, *Simon v. Simon*, 260 Kan. 731, 735, 924 P.2d 1255 (1996), and that the standard of review on such questions is an abuse of discretion. *Stayton v. Stayton*, 211 Kan. 560, 562, 506 P.2d 1172 (1973). However, there is absolutely no support in the record that Homeowners withheld Foshag's reports under a claim of work product, nor did Associated cite to any evidence of this when it argued the matter to the trial court.

Allowing Foshag to testify as to his observations and opinions incidental to his duties would not in any way prejudice Associated. Foshag was listed as a witness on Homeowners' witness list and Associated had been aware of Foshag since his inspection during the July 1993 flood. Foshag's observations were made known to Associated's engineer, Michael Berry, and to its lawyer. Foshag advised Associated to make cuts in the levee, as it was having an adverse effect on Homeowners' properties. He also relayed information to Berry concerning the need to apply for a permit for the levee. Foshag's opinions were quite known to Associated, and it can hardly claim to be surprised by them.

Although Homeowners admit that they never provided a report of Foshag's opinions to Associated, they claim that Foshag is a fact witness and his opinions and reports are a matter of public record. These reports were not developed for Homeowners' litigation purposes, but rather were developed in the course of Foshag's employment by the DWR and were freely available to the public.

As such, Foshag's reports have no comparison to the reports of retained experts and are more similar to accident reports prepared by police officers. Such reports should not be suppressed simply because Associated never obtained copies.

We addressed a similar issue in *Thompson v. KFB Ins. Co.,* 252 Kan. 1010, 1026-27, 850 P.2d 773 (1993), where we held that a "person expected to be called as an expert witness" is typically a consultant whose connection with the case began during trial preparation rather than with the events upon which a plaintiff's claim is based. In deciding that the testimony of a treating physician had not been improperly admitted, we discussed *West v. Martin,* 11 Kan. App. 2d 55, 58, 713 P.2d 957, *rev. denied* 239 Kan. 695 (1986), where the Court of Appeals ruled that the trial court had abused its discretion in refusing to allow the plaintiff's treating physician to express an expert opinion. In *Thompson,* we further stated that K.S.A. 60-456(a) permits opinion testimony by witnesses not testifying as experts if such opinions are incidental to their actual knowledge of the facts and circumstances of the case. 252 Kan. at 1027.

In the present case, Foshag's opinions would be incidental to his involvement and knowledge of the case. Such opinions are incident to his duties as a field inspector for the DWR and a part and parcel of his recommendations and reports to the DWR. Foshag should be permitted to testify about his observations and actions regarding the flood, and some of these actions would make little sense if his opinions were excluded.

Associated and the trial court quoted a portion of Homeowners' reply to Associated's response to their motion to file an amended pleading in order to assert that Homeowners had led Associated to believe that they would not rely upon Foshag's reports to establish causation. This statement was taken out of context. The actual statement was in the midst of discussing why the issuance of a permit for the levee by the DWR did not establish that the levee could not have caused Homeowners' damages. The statement simply argued that when the DWR granted the permit, it had concluded that the levee did not have a significant effect on the entire flood plain, not that it would not cause local flooding.

Foshag appears to have relevant observations, and simply because he has special knowledge and expertise by which he is capable of rendering opinions does not mean that he must be listed as an expert in order to express them in conjunction with his duties by the DWR. It was clearly an abuse of discretion for the trial court to conclude that Foshag's testimony and opinions were not admissible.

*Did the trial court erroneously deny Homeowners' motion to amend their pleading to claim punitive damages?*

We are faced with an entirely different standard of review when examining the trial court's denial of Homeowners' request to claim punitive damages.

The provisions relating to the claims for punitive damages are set forth in K.S.A. 60-3701, K.S.A. 60-3702, and K.S.A. 60-3703. K.S.A. 60-3701 provides in part that "the trier of fact shall determine, concurrent with all other issues presented, whether such [punitive] damages shall be allowed."

The determination by the trial court is made pursuant to K.S.A. 60-3703, which in applicable part states:

"The court may allow the filing of an amended pleading claiming punitive damages on a motion by the party seeking the amended pleading and on the basis of the supporting and opposing affidavits presented that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim pursuant to K.S.A. 60-209, and amendments thereto."

In considering the issue of whether there is a "probability" that plaintiff will prevail, we stated in *Fusaro v. First Family Mtg. Corp.*, 257 Kan. 794, Syl. ¶ 2, 897 P.2d 123 (1995):

"Probability is a term familiar to tort law. It means more likely than not and, when applied to K.S.A. 60-3703, means that it is more likely than not that the plaintiff will prevail on a claim of punitive damages upon trial of the case. Because the standard of proof required in order for plaintiff to prevail on a punitive damages claim at trial is 'clear and convincing' evidence, the trial court exercising its statutory duties under K.S.A. 60-3703 must give consideration to this standard in determining the probability of recovery."

*Fusaro* further held:

"The trial court is to consider the evidence presented in the opposing affidavits as well as other evidence in a light most favorable to the party moving for the amendment, and if the evidence is of sufficient caliber and quality to allow a rational factfinder to find that the defendant acted towards the plaintiff with willful conduct, wanton conduct, fraud, or malice, the trial court shall allow the amendment. This is another way of saying that amendment will be allowed when plaintiff has established that there is a probability that plaintiff will prevail on a punitive claim . . . ." 257 Kan. at 802.

This is an entirely different standard for review upon appeal from that of a grant of summary judgment. In *Fusaro* we also declared:

"Under K.S.A. 60-3703, the decision whether to permit plaintiff to amend is discretionary in that the statute provides that the court *may* allow the filing of an amended petition claiming punitive damages. Thus, our standard of review is one of abuse of discretion.

" ' " Judicial discretion is abused when judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only when no reasonable [person] would take the view adopted by the trial court." ' *In re Marriage of Cray*, 254 Kan. 376, 387, 867 P.2d 291 (1994) (quoting *Stayton v. Stayton*, 211 Kan. 560, 562, 506 P.2d 1172 [1973])." 257 Kan. at 804.

Even though the trial court is required to view the evidence as disclosed from the affidavits in the light most favorable to the party seeking amendment, we find no abuse of discretion on the trial court's part in denying Homeowners' attempt to claim punitive damages in this instance. The evidence Homeowners relied upon to establish Associated's knowledge of the potential danger to Homeowners' properties is subject to conflicting interpretations, such that it would not be likely to clearly and convincingly prove Associated acted willfully or wantonly.

First, the warning letter from Homeowners' attorney to Associated in 1984 cannot be found to directly relate to the facts which later existed. Next, Associated placed the overburden dirt in an area designated by an expert. In addition, Homeowners produced no evidence that Associated had been told a permit for its overburden pile was statutorily required.

Finally, we agree the placement of the unsuccessful temporary dikes for a minimal period of time does not rise to the level of clear and convincing evidence of willful or wanton conduct. The phone call to Nadine Stannard showed her desire to protect Associated's property, but it also is not sufficient to require submission of the issue of punitive damages to a jury.

When making the determination which a trial court has discretion to make, we find the trial court was clearly within its justifiable grounds in denying the request to add a claim for punitive damages.

The trial court's denial of the motion to amend Homeowners' pleading to include a claim of punitive damages is affirmed. The granting of the motion for summary judgment is reversed. The case is remanded for trial in accordance with this opinion.

ABBOTT, J., not participating.

E. NEWTON VICKERS, Senior Judge, assigned.