No. 82,007

STATE OF KANSAS, *Appellee,* v. GREGORY A. STRUZIK, *Appellant.*
(5 P.3d 502)

Opinion filed April 21, 2000.

*Janine Cox*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Kristie A. Coup*, assistant county attorney, argued the cause, and *E. Leigh Hood*, county attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals a conviction of first-degree felony murder based on felony abuse of a child, claiming (1) the evidence was insufficient to sustain the conviction; (2) the expert witnesses invaded the province of the jury; (3) the trial court improperly instructed the jury regarding deadlock; (4) the trial court failed to instruct on lesser included offenses; and (5) the cumulative trial errors require reversal of the conviction.

Troy Manis, age 3, died on June 28, 1996. The cause of his death was blunt trauma to the head.

The child's mother, Debra Manis, left Troy in the care of a friend, Gregory Struzik, at approximately 11:30 a.m. on June 26, 1996. Struzik stated to investigating officers that while Troy was in his care, the child was normal and active until approximately 6:30 p.m. when Troy fell down several stairs. After Troy's fall, he put Troy down for a nap in the bedroom. Debra returned to Struzik's home at approximately 7 p.m. Struzik was asleep on the couch. Debra checked Troy and then lay down on the couch to nap with Struzik. Debra awoke around 9 p.m. and left the house to get a carry-out dinner. When Debra returned approximately 30 minutes later, she and Struzik ate. Troy continued to sleep. After dinner, Struzik brought Troy into the living room to sleep on the couch for the night. Troy was unconscious and began to have posturing or seizure activity. Troy was taken to the hospital in Dodge City

and shortly thereafter was transported by air to Wesley Medical Center in Wichita.

When admitted to Wesley Medical Center, Troy was comatose and unresponsive except for posturing activity, did not respond to light, and had a fixed gaze, asymmetrical pupils, and multiple bruises about his body. There was a hemorrhage behind his right eye and no upper brain functioning. A CT-scan indicated bleeding on the surface of Troy's brain and significant brain swelling. By the second day of hospitalization, Troy showed signs of brain death. On June 28, 1996, Troy was pronounced dead.

After an investigation, Struzik was charged in Ford County District Court with first-degree felony murder. The complaint alleged that Struzik caused the death of Troy during the commission of an inherently dangerous felony, *i.e.*, abuse of a child. Struzik was tried to a jury on December 8-13, 1997.

At trial, Struzik denied hitting or shaking Troy. His defense was that either Troy suffered injuries which resulted in delayed brain swelling prior to Debra leaving Troy in his care or that the accidental fall down the stairs while Struzik was caring for Troy caused the brain swelling and eventual death. The jury found Struzik guilty. The district court sentenced Struzik to life imprisonment with parole eligibility after 15 years.

## SUFFICIENCY OF THE EVIDENCE

Struzik first contends that because there was evidence in which the jury could have concluded that the injuries which resulted in Troy's death had been inflicted prior to Debra leaving Troy in Struzik's care, the evidence was insufficient to sustain the conviction. When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Johnson*, 266 Kan. 322, 326, 970 P.2d 990 (1998). A conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Smith*, 245 Kan. 381, 393, 781 P.2d 666 (1989).

There was evidence that prior to the date of the fatal injuries, Debra had hit, kicked, and verbally abused Troy. However, Debra was not a suspect for causing her son's death because she did not have access to Troy when, according to the medical experts, the fatal injuries were inflicted.

Struzik testified that he was the sole caretaker of Troy during the hours immediately preceding the head trauma that resulted in Troy's death. Struzik testified that while Troy was in his care, he and Troy played video games, tickling games, chased around the house, played in the backyard, went for a walk, and played on the swings at a neighborhood park. Struzik stated that after playing in the park, they returned home and Troy accidently fell down the stairs while Struzik was in the bathroom. Struzik testified that although Troy appeared to be less rambunctious than normal, Troy did not cry or fuss more than usual.

For support of his theory, Struzik points out that at trial one of the State's experts, Dr. Jill Gould, testified that Troy's fatal injuries could have been sustained up to 72 hours prior to the onset of symptoms. Struzik argues that since the basis for conviction was his sole access to Troy in the hours immediately preceding the onset of trauma symptoms, the possibility of an earlier act from which Troy could have sustained the fatal head trauma and the possibility of delayed brain swelling creates reasonable doubt as to his guilt.

Dr. Gould, the forensic pathologist who performed Troy's autopsy, testified that Troy died as a result of subdural hematomas over the entire surface of his brain and brain swelling. Dr. Gould opined that due to the severity of Troy's injuries, Troy would have been symptomatic immediately after receiving the injuries. When questioned about the possibility of delayed brain swelling, Dr. Gould stated that although in some cases brain swelling may be delayed for 12 to 72 hours after an injury, it was her medical opinion that Troy's injury did not occur within that time frame because of Struzik's account of the child's activities after the alleged fall. Struzik had informed the investigators that Troy had been engaged in normal play prior to the onset of the symptoms which led to his hospitalization. Dr. Gould stated that a period of normal func-

tioning as claimed by the defendant was not consistent with the character and extent of Troy's brain injury.

Struzik also argues there exists a possibility that Debra inflicted the fatal injuries on Troy between 7 and 9 p.m. Struzik asserts that while he slept on the couch, Debra could have entered the bedroom where Troy was sleeping and inflicted the nine multidirectional blows to his head and various other injuries.

The jury could have believed that while Struzik slept on the couch, Debra entered the bedroom where Troy was sleeping and inflicted nine multidirectional blows to his head and various other injuries, but it did not. The function of weighing the evidence and passing on credibility belongs to the jury, not to us. A verdict secured on substantial competent evidence will not be disturbed on appellate review. *State v. Borthwick*, 255 Kan. 899, 904-05, 880 P.2d 1261 (1994) (quoting *State v. Cooper*, 252 Kan. 340, 347, 845 P.2d 631 [1993]). The expert evidence was sufficient for a rational factfinder to conclude that Struzik inflicted Troy's fatal injuries prior to putting Troy in bed for a nap.

## EXPERT TESTIMONY

It is necessary that the facts upon which an expert relies for his or her opinion should afford a reasonably accurate basis for his or her conclusions as distinguished from mere guess or conjecture. Expert witnesses are to confine their opinions to relevant matters which are certain or probable, not those which are merely possible. *Nunez v. Wilson*, 211 Kan. 443, 445-46, 507 P.2d 329 (1973).

Although an expert may give an opinion on an ultimate issue as provided in K.S.A. 60-456(d), such witness may do so only insofar as the witness aids the jury in the interpretation of technical facts or assists the jury in understanding the material in evidence. An expert witness may not pass on the weight or credibility of evidence, for those matters are strictly within the province of the jury. *State v. Mullins*, 267 Kan. 84, 94, 977 P.2d 931 (1999). Struzik contends that the medical expert witnesses acted as advocates for the State. He complains that the experts refused to consider the possibility that Troy's injuries were sustained in a manner other than by abuse.

### Testimony of Dr. Lindall Smith

Struzik asserts that Dr. Lindall Smith, Troy's pediatric critical care physician at Wesley Hospital, refused to consider the possibility that Troy's injuries occurred in a manner other than by abuse. He asserts that Dr. Smith's testimony was such that a reasonable juror would conclude that Dr. Smith believed that Struzik was the perpetrator of the abuse that resulted in Troy's injuries and eventual death.

Dr. Smith testified that it was his duty as a physician to identify cases of possible child abuse to be reported to the authorities. He explained the criteria for determining whether to report possible child abuse is the severity of the child's injury and the explanation by the caretaker's statement of how the injury occurred. In Troy's case, Dr. Smith and the other doctors responsible for Troy's care after hospitalization were to determine if the explanation for Troy's injuries, a fall down the stairs, was consistent with the severity of the child's injuries. Dr. Smith explained that a child's fall down the stairs generally results in minor injuries such as broken bones or broken teeth and bruises on high impact areas. It was the doctor's opinion that in this case the fatal brain trauma was not an injury consistent with a fall down the stairs.

Dr. Smith stated that most children with injuries similar to Troy's were unrestrained passenger injuries suffered by a child in motor vehicle accidents or injuries inflicted as a result of child abuse. Dr. Smith observed that Troy's injuries were not consistent with a delayed brain swelling reaction and noted that most children with the type of head injury Troy sustained would, within minutes of the injury, lose consciousness. Children who remain conscious after such injury are dysfunctional—irritable, inconsolable, and not able to eat, drink, walk, or talk.

Struzik is incorrect that Dr. Smith would entertain no possibility other than that Troy's injuries occurred in a manner other than by abuse. Dr. Smith testified that he had treated children with similar injuries resulting in motor vehicle accidents. The essence of Struzik's complaint is that Dr. Smith would not testify that Troy's injuries were consistent with a fall down the stairs or agree that Troy

would have been able to sustain a period of normal activity after the injury that resulted in his death was inflicted.

In *State v. Smallwood*, 264 Kan. 69, Syl. ¶ 4, 955 P.2d 1209 (1998), this court stated that under K.S.A. 60-456(d) expert testimony in the form of an opinion is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of fact.

Here, Dr. Smith's testimony contradicts Struzik's theory of defense that Troy suffered from delayed brain swelling or that he died as a result of an accidental fall down the stairs. The defining point, however, is that Dr. Smith's testimony was based on medical evidence involving the character and severity of Troy's injuries, not Dr. Smith's opinion of Struzik's veracity or credibility. Therefore, Dr. Smith's testimony did not extend beyond the limits of acceptable expert medical testimony.

### Testimony of Dr. Kathryn Melhorn

Dr. Kathryn Melhorn, a pediatrician and a member of the child protection team that reviewed Troy's death, also testified as an expert at trial. Like Dr. Smith, Dr. Melhorn stated that Troy's injuries were not consistent with a fall down the stairs. Struzik asserts that Dr. Melhorn testified that (1) Troy's injuries were caused by a person in rage; (2) there was "no evidence" that Troy had any injuries prior to noon on June 26, 1996 to contribute to the fall down the stairs; and (3) there was "no other explanation for this child's injuries."

### Rage Remark

Dr. Melhorn testified that Troy had suffered nine multidirectional traumas to his head. She stated to the jury that blunt trauma to the head is inconsistent with ordinary bumps and accidental collisions with furniture and stairs. She based her opinion on her experience and on a study of autopsy findings where children who had died of accidental injuries were compared with autopsy findings of children who died from suspected child abuse caused injuries. Dr. Melhorn was asked by the prosecutor what it would take for someone to intentionally inflict the nine multidirectional trau-

mas Troy had suffered. Dr. Melhorn replied, "This takes a person in a rage." The defense attorney objected. The judge stated, "The speculation as to what emotional content might be in a person's mind, I think, is too far. So you can testify as to what you think may have caused it, but not to what their emotional state may be." Dr. Melhorn confined her response to the type of blows Troy's injuries indicated, *i.e.*, repetitive blunt trauma with forceful back and forth shaking.

Although Dr. Melhorn's rage remark was outside the scope of expert medical testimony, it was objected to and immediately corrected and does not form the basis for trial error.

### No Evidence of Prior Contributing Injuries

Dr. Melhorn was also asked on direct examination if there was other medical evidence that Troy had an injury prior to noon on June 26, 1996, that could have contributed to the fall down the stairs at 6:30 the same evening. Dr. Melhorn responded that there was no such medical evidence.

Dr. Melhorn's response did not comment on Struzik's veracity and did not express an opinion about Struzik's culpability. Dr. Melhorn's response was based on the medical evidence as to Troy's injuries and did not invade the province of the jury.

### No Other Explanation for Injuries

Finally, Dr. Melhorn's remark that there was "no other explanation for this child's injuries" occurred during defense cross-examination and referred to the "massive severe trauma" as the cause of a "very rapid death." Dr. Melhorn described the type of injury that results in massive severe head trauma such as Troy's, stating:

"The subdural hematoma does not cause the death, it's a marker of the pattern of the injury that occurred to this child. The rapid acceleration, deceleration injury that happens to this kid's head when it's going around and back and forth and around, and that brain is rattling around inside of the head, the vessels get sheered and the blood collects. That's a marker of that type of injury. What actually caused the death is the brain tissue being torn apart, and the edema, the swelling that happens that causes the brain to basically choke itself off, and that happens very acutely, making the child symptomatic from the time of the injury until the child dies."

The defense attorney then posited that since Dr. Melhorn had not seen the stairs in question, her opinion about what caused the trauma was merely speculative. Dr. Melhorn responded, "I don't know exactly what happened and who did it, but there is no other explanation for this child's injuries." In other words, Dr. Melhorn's opinion was confined to a description of the mechanism necessary to produce an injury such as Troy sustained. The fact that the mechanism described by Melhorn was inconsistent with Struzik's theory that Troy's injury resulted from a fall on the stairs was a result of the medical evidence, not her belief in Struzik's guilt or innocence. Her expert opinion did not embrace the ultimate issue to be decided by the trier of fact, *i.e.*, whether the defendant's actions caused the death of the child.

## *ALLEN*-TYPE INSTRUCTION

Struzik contends that the judge erred by sua sponte giving the jury a deadlock instruction which set time constraints on its deliberations. The instruction Struzik complains of was an *"Allen*-type" instruction, given to encourage the jury to work together to reach a verdict. See *Allen v. United States,* 164 U.S. 492, 501-02, 41 L. Ed. 528, 17 S. Ct. 154 (1896), where the United States Supreme Court in discussing the giving of a deadlocked jury instruction stated:

"The seventeenth and eighteenth assignments were taken to instructions given to the jury after the main charge was delivered, and when the jury had returned to the court, apparently for further instructions. These instructions were quite lengthy and were, in substance, that in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority. These instructions were taken literally from a charge in a criminal

case which was approved of by the Supreme Court of Massachusetts in *Commonwealth v. Tuey*, 8 Cush. 1, and by the Supreme Court of Connecticut in *State v. Smith*, 49 Connecticut 376, 386.

"While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury-room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury-room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself. There was no error in these instructions." 164 U.S. at 501-02.

After being instructed to determine Struzik's guilt, the jury during deliberations requested a readback of a portion of the testimony. Before the readback, the judge asked the jury who it had selected as the presiding juror. The judge then asked the presiding juror whether she had any reasonable expectation that continued deliberation would result in a verdict. The presiding juror answered, "No." The judge then asked, "Would you believe that a night's rest would help [and] perhaps allow you to come back with refreshed minds?" Again, the juror responded, "No." The court then stated:

"It is understandable that 12 persons may have differing opinions as to either the significance of testimony and evidence or whether a cumulation, or rather, the evidence in total leads to one conclusion as opposed to another. It cannot be expected that your differences could be totally removed. I want to inquire whether if you go back and have additional deliberations whether the differences are so great that they simply cannot be addressed, or whether there is something that you believe additional deliberations may address eventually?"

The presiding juror responded, "I don't think so." The judge then asked, "Do you think that your differences are so great that you cannot address them at all [and] cannot resolve them." The juror again answered, "I don't think so." The judge asked, "Have the differences been repeated over and over, and repeated efforts to come to a resolution of your differences?" The presiding juror an-

swered, "Yes." The judge asked the juror if a night's sleep would help:

"I know at this time of the day [that] fatigue may enter into the inability to reach agreement. I will ask the jury as a whole, do any of you believe that a night's rest would assist you in deliberating further in this case? Any of you just feel like you're so tired you want to quit for awhile?"

## Various jurors answered, "I do." The judge then asked:

"Let me ask you for a show of hands how many of you believe it would be worth a further try, if you were to go home, get some rest and come back either tomorrow, or Monday. . . . There are many reasons why the Court prefers an additional effort, and that is because of the great effort that is required to try a case. I realize it just gets tiring after a full week of trial. I'm going to request that you come back tomorrow, give it a rest. Let's come back tomorrow at 9 o'clock in the morning. I will give you a reasonable time to address your differences then, and if you cannot reach a verdict, then there is only one thing we can do and that is terminate the trial. But, I want you to come back and give it a reasonable effort and then we can inquire after a reasonable amount of time tomorrow morning."

## The following morning, the judge admonished the jury:

"Members of the jury, you are not required to abandon your reasoning or the conclusions which that reasoning produces unless the reasoning or conclusions [are] not founded upon the evidence and the law which you received. All that we can ask of you is a good faith effort and an attempt to work out the differences in the conclusions that you may have reached individually in order to obtain a collective verdict. I can only ask for that good faith effort. I cannot ask for any of you to suffer abuse, and I cannot ask for any of you to abandon what you believe is a well reasoned conclusion. I'm going to ask you to make one more good faith effort at deliberation. It is 10 after nine. I'm going to ask that you enter deliberation and after a good faith effort, if it appears conclusively that you cannot reach a verdict unanimously, then I want you to report that to me. You may report that before an hour, if you are willing to work for an hour, I'll not require you to work beyond an hour before you report to me. So, I want you to report either that you determine that you cannot reach a verdict after you've made a good faith effort, or in one hour, whichever is earlier. So, I will release you now to the bailiff's custody and ask that you reconvene your deliberation."

## After the jury retired, the prosecutor stated:

"Judge, are you going to give the Allen instruction? The case law indicates that you can still give it since the jury hasn't come back and said they are deadlocked. What happened was we misread that [they] may be deadlock[ed]. I think that may be an appropriate instruction to write and send in."

The judge replied, "That was the handle of the hammer." The prosecutor then asked if the defense had any objection to the judge's instruction. The defense counsel answered, "Not the way he gave it." An hour later, the jury returned with a verdict of guilty.

No party may assign as error the giving or failure to give an instruction unless he or she objects before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of his or her objection, unless the instruction or the failure to give the instruction is clearly erroneous. K.S.A. 22-3414. Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *State v. Henry*, 263 Kan. 118, 131, 947 P.2d 1020 (1997).

Because Struzik did not object to the judge's sua sponte instruction, the instruction will not constitute reversible error unless it was clearly erroneous. Struzik argues that the instruction was clearly erroneous because (1) the instruction was not given at the close of evidence with the other instructions, therefore, the jury gave undue weight to the court's instruction; (2) the jury did not state it was deadlocked but revealed a problem with deliberations after the judge questioned the jury about deadlock; (3) the evidence was not overwhelming; and (4) the court coerced the jury and deprived him of a fair trial by informing the jury it had one hour to reach a verdict, and if it failed to reach a verdict within that time limitation, the court would declare a mistrial.

Neither the judge, the prosecutor, nor the defense attorney noted that prior to the United States Supreme Court 1896 decision in *Allen*, this court had reached the opposite conclusion in *State v. Bybee*, 17 Kan. 462 (1877), where the defendant took issue with a deadlock instruction. After the case had been submitted to the jury and after the jury had deliberated upon its verdict several hours, it was brought into court and asked by the court if it had agreed upon a verdict. The jury answered in the negative, and the court addressed them as follows:

" '*Gentlemen of the Jury*: I am led to infer from the character of your communications to me that you think it impossible to agree, and desire to be discharged. You have heard the evidence, and the case has been ably argued by

counsel, and the court has afforded every facility to enable you to understand the case. The trial has been very expensive to the public, and has occupied a great deal of time and attention, and it is not possible that it will ever be more clearly presented than it has been in this its first presentation to a jury. I do not desire to try the case again. It is often considered a reflection on the court, and upon you, as jurors, should you not agree. You have been impanneled to come to an agreement, not to wrangle over pet ideas and theories. It is the duty of the jury to agree if possible. The theory of an agreement by the jury is, that twelve minds are brought as nearly together as it is possible for twelve minds to come. To bring about this result, it is necessary for the individual juror (in matters of detail, and on questions of minor importance,) to defer to some extent to his fellow jurors, and to surrender some of his own ideas and opinions to what seems to be an overwhelming sentiment against him. None of us are infallible. And in your deliberations you should realize this, and mutually depend upon each other. And in the consideration of the details of the case, you should meet the questions as they arise, in a spirit of mutual concession and forbearance, and thus gradually as you proceed step by step to arrive at a conclusion to which you can all assent, although if left to yourselves you would probably come to a different conclusion. You should bring your minds together like the mixing of different ingredients by an apothecary, and ascertain what is the product. In a case of this importance I feel it to be my duty to afford you the most ample opportunity to agree. It is not my purpose to force you to a verdict not in accordance with your convictions. My experience with juries has taught me that they often agree after they have imagined it impossible to do so, and after the agreement they have been surprised that they ever disagreed. I hope this will be your experience. I therefore urge upon you to make another effort, in a spirit of reconciliation, and fairness to each other, to the accused, and to the public, and if possible agree upon a verdict; and I warn you not to think of being discharged for some time to come.' " 17 Kan. at 464-65.

### Regarding the instruction, the *Bybee* court stated:

"We are constrained to believe, after a careful examination of the record, that the jury were misled by this instruction, and that there ought to be a retrial. The testimony impresses us forcibly with the conviction, that the defendant was either guilty of an offense higher than that of which he was found guilty, or guiltless of any offense. The prosecuting witness, and his wife, testified that defendant and another party came to their house in the night-time, and standing within twenty feet, fired several shots into the building. The building was a log house, one story, and one room, and the chinking between the logs had dropped out so that the cracks between the logs were open, from the width of a hand, up. Some of the bullets passed through the bedtick upon which prosecuting witness and his wife were sleeping. There was testimony also of a previous quarrel, and ill-feeling between the parties. The defendant denied the shooting, or being present at or near the house of the prosecuting witness that night, and testified that he was at his own home all the night. There was also corroborating testimony, but there

were distinctly the two lines of evidence. Now had the jury credited the defendant's testimony, they could not have done otherwise than acquit; and it seems to us, that had they credited the testimony of The State, they must have found the defendant guilty of something more than a mere assault. And the punishment which the court imposed, a fine of five hundred dollars, indicates its judgment as to the aggravated character of the offense. It also appears, both from the bill of exceptions and from other parts of the record, that the jury were for a long time unable to agree; and if we may credit some of the affidavits filed upon the motion for a new trial, were evenly divided. It seems to us under these circumstances, that the remarks of the learned court were calculated to exert too strong a pressure upon the jury in favor of the agreement. It may not perhaps be possible to single out any particular sentence, and say that this is, strictly speaking, and taken by itself, erroneous, and sufficient to justify a reversal, though there are some that seem to trespass a good deal on the right and duty of each juror to the free exercise of his individual judgment. Yet the general impression of these instructions, as we read them, and as it seems to us must have been received by the jury, is, that the jury ought, by compromise, and surrender of individual convictions if necessary, to come to an agreement, and that a failure to do so would be an imputation upon both jury and court. Now while a court may properly call the attention of the jury to many matters which increase the desirability of agreement, such as the time already taken, the improbability of securing additional testimony, the general public benefit in a speedy close of a litigation, and, at least in cases where the matters at stake are of minor importance, the question of the expense to the parties and the public, yet no juror should be influenced to a verdict by a fear of personal disgrace, or pecuniary injury. No juror should be induced to agree to a verdict by a fear that a failure to so agree would be regarded by the public as reflecting upon either his intelligence, or his integrity. Personal considerations should never be permitted to influence his conclusions; and the thought of them should never be presented to him as a motive for action. Nor do we think the illustration given by the learned judge a happy one. A verdict is the expression of the concurrence of individual judgments, rather than the product of mixed thoughts. It is not the theory of jury trials, that the individual conclusions of the jurors should be added up, the sum divided by twelve, and the quotient declared the verdict, but that from the testimony each individual juror should be led to the same conclusion; and this unanimous conclusion of twelve different minds, is the certainty of fact sought in the law. Especially is this true in criminal trials. Here should no thought of compromise be tolerated. Before the state can fairly demand the conviction and punishment of an alleged criminal, the twelve jurors should each be led from the testimony to a clear conviction of his guilt; and where six jurors believe a defendant guilty of murder, and six believe him innocent of any offense, it is an outrage for the twelve to bring in a compromise verdict of guilty of manslaughter. We fear that something of this kind occurred in this case, and that the charge above quoted was mainly instrumental in producing this result. At any rate, it seems to us clear, that such would be the tendency of those instructions; and it is

not apparent that it did not have that effect. For this error the judgment must be reversed, and the case remanded with instructions to grant a new trial." 17 Kan. at 465-67.

The *Bybee* court concluded by stating:

"All of the present members of this court have had experience as district judges, and know what is their solicitude for the agreement of juries, and their repugnance to see the labors of a trial prove abortive through the failure of the jury to agree. We therefore fully appreciate the considerations which induced these instructions from the learned judge, and fully sympathize with the spirit which controlled him, but are nevertheless constrained to believe that he passed beyond the line which should limit the counsels and instructions of a court to a jury, and that thereby the material rights of the defendant were prejudiced." 17 Kan. at 467.

This court's reasoning for continued disapproval of a deadlock instruction given after the jury has begun deliberations is that such an instruction could be coercive or exert undue pressure on the jury to reach a verdict. One of the primary concerns with an *Allen*-type instruction has always been its timing. When the instruction is given before jury deliberations, some of the questions as to its coercive effect are removed.

PIK Crim. 3d 68.12 states:

"This is an important case. If you should fail to reach a decision, the case is left open and undecided. Like all cases, it must be decided sometime. Another trial would be a heavy burden on both sides.

"There is no reason to believe that the case can be tried again any better or more exhaustively than it has been. There is no reason to believe that more evidence or clearer evidence would be produced on behalf of either side.

"Also, there is no reason to believe that the case would ever be submitted to 12 people more intelligent or more impartial or more reasonable than you. Any future jury must be selected in the same manner that you were.

"[These matters are mentioned now because some of them may not have been in your thoughts.]

"This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision.

"This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor. If at all possible, you should resolve any differences and come to a common conclusion [so that this case may be completed.]

"You may be as leisurely in your deliberations as the occasion may require and take all the time you feel necessary.

"[The giving of this instruction at this time in no way means it is more important than any other instruction. On the contrary, you should consider this instruction together with and as a part of the instructions which I previously gave you.]"

"[You may now retire and continue your deliberations in such manner as may be determined by your good judgment as reasonable people.]"

The bracketed portions of the instruction are to be given where the instruction is given after jury deliberations have begun.

In the Comment following PIK Crim. 3d 68.12, the following information is provided:

"It was held there was no error in giving PIK Civil 10.20 in *State v. Oswald*, 197 Kan. 251, 417 P.2d 261 (1996). 'However,' said the Court, 'as a word of caution, this instruction quite properly could have been given at the time of the original charge.' The practice of lecturing a jury in a criminal case after reported disagreement was not commended. Oral comments accompanying this instruction were held to be coercive and prejudicial error in *State v. Earsery*, 199 Kan. 208, 428 P.2d 794 (1967), but their effect, standing alone in that case, was not determined. A belated instruction was criticized, but, under attending circumstances indicating that the judge's remarks had no immediate coercive effect, the instruction was held not to be reversible error in *State v. Basker*, 198 Kan. 242, 424 P.2d 535 (1967)."

Although this court has for 123 years stated an *Allen*-type instruction should not be given in criminal cases—it has upheld some convictions where modified *Allen*-type instructions have been given. In *State v. Oswald*, 197 Kan. 251, 261, 417 P.2d 261 (1996), this court stated "[t]he practice of lecturing a jury in a criminal case after it has reported a failure to agree is not to be commended and . . . might well be held coercive and erroneous as invading the province of the jury." It noted the instruction should have been given with the other instructions to the jury.

In *State v. Troy*, 215 Kan. 369, 372-73, 524 P.2d 1121 (1974), the defendant alleged error concerning the giving of *Allen*-type instruction under these circumstances. At approximately 2:40 p.m. the jury retired to deliberate. It returned at 3:05 to have certain testimony read and retired again at 3:50. It was 5:13 when the jury reported it was unable to reach a decision. The court thereupon gave the following instruction:

"The case has been exhaustively and carefully tried by both sides and has been submitted to you for decision and verdict. Although under the law, a verdict must be unanimous, and should be based upon honest judgment, not mere acquiescence for the sake of expediency, it is still necessary that you examine the matters submitted to you with the proper regard for and deference to the opinion of each other. A proper regard for the judgment of each other should help you greatly in forming your own judgment. There is no reason to think that a jury better qualified than you would ever be chosen to try this case. Therefore, each of you should listen to the arguments of the others with an openmindedness characteristic of a disposition to be convinced by them, and if you differ in your views of the evidence, you should all be led by such differences of opinion to scrutinize the evidence more closely and to re-examine more carefully the grounds of your opinion. You should, after all, decide the issues of fact which have been submitted to you. In conferring, you should lay aside all mere pride of opinion, and you should bear in mind that the jury room is no place for espousing and maintaining in a spirit of controversy either side of a particular cause. The aim to be kept in view is the truth as it appears from the evidence, which evidence you must consider with the instructions of the court." 215 Kan. at 372.

The jury retired a third time at 5:18 and approximately 13 minutes thereafter returned a verdict of guilty.

The *Troy* court observed that the Committee on Uniform Pattern Instructions had recommended that an *Allen* instruction not be given in criminal cases. In its discussion of the instruction, the *Troy* court noted that on more than one occasion appellate courts had criticized the giving of such a charge after the jury has reported it has reached an impasse, although in most instances it had held the instruction non-prejudicial.

The *Troy* court disapproved both the instruction and its timing. It warned that instructions which savor of coercion, pressure, or constraint are especially to be avoided after jurors have reported themselves as unable to agree upon a verdict. However, the *Troy* court concluded that reversal was not required because no objection was interposed to the instruction when it was given and because the error did not rise to the height of prejudice. In view of the compelling evidence, the *Troy* court deemed the instruction did not approach prejudicial proportions to the damage of defendant's cause. 215 Kan. at 373.

In *State v. Whitaker*, 255 Kan. 118, 872 P.2d 278 (1994), the defendant challenged a modified *Allen* instruction. This court ap-

proved the use of PIK instructions but found that the non-PIK instruction given in that case was not clearly erroneous because it did not require the jurors to change their votes or compromise their individual judgments for the sake of reaching an agreement or judicial expediency. 255 Kan. at 128.

Although Struzik contends that the oral instruction pressured the jury by setting a time limit on its deliberations, the judge was clear that the time limit was to prevent a prolonged attempt at fruitless deliberations. The judge's instruction communicated sincere concern for the well being of the jurors and fairness to the parties and was not coercive or worded in such a way as to pressure the jury to convict Struzik. As such, the instruction did not require the jury to reach a verdict; therefore, it was not coercive and giving the instruction was not clearly erroneous.

Finally, the evidence in the case was overwhelming. There was undisputed medical testimony from three experts that Troy had died due to severe head trauma inflicted in the hours that Struzik was Troy's sole caretaker. The experts testified that the injuries were not consistent with an accident, but with blows. Struzik's own testimony established that he was Troy's caretaker at the time when the experts determined Troy suffered the fatal injuries. Therefore, we are firmly convinced that the sua sponte instruction by the judge, though improper, created no real possibility the jury would have rendered a different verdict if the instruction had not been given.

## INSTRUCTIONS ON LESSER INCLUDED OFFENSES

After the evidence had been submitted to the jury, Struzik requested the judge to instruct the jury on reckless second-degree murder and reckless involuntary manslaughter. The judge refused to give the instructions because Struzik had testified that he did not harm Troy. Struzik's defense was either that Troy sustained the fatal injuries from an accidental fall or that Troy sustained the injuries prior to being left in his care. The judge concluded there was no evidence of reckless conduct and refused to give a lesser instruction.

The rule in Kansas regarding felony murder is that the jury need not be instructed on lesser offenses unless evidence of the underlying felony is weak and inconclusive. *State v. Heath*, 264 Kan. 557, 572, 957 P.2d 449 (1998). Struzik was convicted of felony murder from an underlying count of abuse of a child. The only intent required for the offense of abuse of a child is the act of hitting or hurting. It was not necessary for the jury to find that Struzik intentionally caused the death of Troy.

Based on Struzik's testimony, he did not hit or harm Troy in any manner. Intent is not an issue in felony murder. If the jury believed Struzik, it would have acquitted him of the charges. If Struzik abused the child, his act supplied the elements of deliberation and premeditation, acts which are absent in second-degree murder and manslaughter. Thus, either the child abuse was perpetrated by Struzik and he was necessarily responsible for the murder, or he did not perpetrate the child abuse or recklessly harm the child and was not guilty of any degree of homicide. See 264 Kan. at 572-73.

## CUMULATIVE TRIAL ERROR

Cumulative trial errors, when considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. *State v. Allison*, 259 Kan. 25, 37-38, 910 P.2d 817 (1996).

The analysis of the issues presented reveals no identifiable trial errors. Therefore, any errors committed by the trial court were not so great as to require reversal of Struzik's conviction.

Affirmed.