(178 P.3d 42)
No. 95,995

STATE OF KANSAS, *Appellee,* v. WILLIAM JAMES BLOMQUIST,
*Appellant.*

Opinion filed February 29, 2008.

*Rachel Pickering,* of Kansas Appellate Defender Office, for appellant.

*Frederick B. Campbell,* county attorney, and *Paul J. Morrison,* attorney general, for appellee.

Before MARQUARDT, P.J., BUSER, J., and LARSON, S.J.

BUSER, J.: William Blomquist appeals his convictions of 26 counts of aggravated indecent liberties with a child, K.S.A. 21-3504(a)(3)(A), 26 counts of aggravated criminal sodomy, K.S.A. 21-3506(a)(1), and 26 counts of aggravated indecent solicitation of a

child, K.S.A. 21-3511(a). We reverse the convictions and remand for a new trial.

## Factual and Procedural Background

At the time of these incidents, B.D. was a 12-year-old boy whose IQ placed him in the middle range of mental retardation. This disability also affected B.D.'s communication, social, and behavioral skills.

During the fall and winter of 2004, B.D. frequently stayed overnight at the Anderson County residence of Sharon Blomquist and her 31-year-old unemployed son, William. William had befriended B.D. and his mother, Carla. According to Carla, B.D. enjoyed spending time with William because there were many child-friendly activities at his home, including working on cars, model building, and movies.

Eventually, Carla began to wonder if something was amiss. She sat down with B.D. and asked him if anyone had ever touched him or if anything had ever happened between him and William. B.D. became upset, and after initially denying any such touching, confided to his mother that he and William had engaged in lewd fondling and oral and anal sodomy.

William was ultimately charged with one count each of aggravated indecent liberties with a child, aggravated criminal sodomy, and aggravated indecent solicitation of a child, on 26 dates from September 18, 2004, to December 29, 2004, for a total of 78 counts. At the preliminary hearing, the prosecutor explained the charging document as follows:

"[N]ow through investigation of journals kept by [Sharon], . . . [B.D.], as a child . . . was sort of vague on dates and he could tell us what happened, but exact times and number were somewhat vague. So using the journals, we were able to come up with the specific dates that [B.D.] stayed [at the Blomquist residence]."

The trial began on August 29, 2005. Beginning with his opening statement to the jury, continuing through the presentation of evidence, and culminating in the closing arguments, the prosecutor framed the State's case around the allegation that William was a homosexual.

From the third sentence of his opening statement, the prosecutor said:

"The defendant, William . . . was a . . . homosexual who had spent a great deal of time and energy both hiding his sexuality and winning the trust of [B.D.'s] mother Carla.

"By September 17th of 2004 [William's] groundwork had been laid and the seduction of [B.D.] begun [*sic*]. . . .

. . . .

"What Carla did not know was that [William] had broken up with his boyfriend, Brandon . . . , in June. On Tuesday, June 8th, as shown in [Sharon's] journals, 2:14 in the morning. [William] woke Sharon . . . and told her that he and Brandon had had sexual relations and that Brandon had slept with someone else the Saturday before. But in the journals you can see that Sharon saw this coming because she had been recording it in her journals for months.

"In fact, [the] journals show that [William] and Brandon had been sleeping together in [William's] room in her house as early as December 21st of 2003. On January 6th, 2004, Sharon noted a hickey on his neck and [William] told her it was from Brandon pinching him. Later that same month she noted that Brandon hit [William] in the eye with his elbow while sleeping and [William] used makeup to cover the discoloration.

"By May 29th [William] and Brandon's relationship was crumbling and [William] was crying because he had called Brandon for the second time and Brandon did not want to come down and see him. By June 7th, Sharon could not believe that [William] would return . . . Brandon's calls and states, 'At least he didn't hang up crying.'

"That same evening, Chris Kresyman . . . was there with his kids. And in her journals Sharon noted that after the kids left [William] was more jovial. And then began [William's] efforts to work his way into [B.D.'s] life.

. . . .

"By September Carla's trust was secured and [William] began the seduction."

The prosecutor pointed out that "unlike the other men in her life previously," William had not "attempt[ed] to get into Carla's bed."

Defense counsel made no objections to the prosecutor's statements. In his opening statement, William's counsel only countered that "[m]y client will deny he is a homosexual."

During the testimony of the State's first witness, Anderson County Sheriff's Deputy Paris Stahl, the prosecutor presented a video recording of Deputy Stahl's interview of William. Deputy Stahl asked William about his "opinion on gay people," to which William responded: "I don't have a major problem with them but

I don't agree with that lifestyle." The deputy returned to the question later in the interview:

"[Q.] . . . [Y]ou say you don't have a problem with homosexuals. I mean it's out there, it happens.

"[A.] I don't—what do you mean like a problem, like I have—if I seen [sic] one, I'd go out and like try to bodily harm them like or something? Is that what you mean?

"[Q.] No, I'm just saying, um if you're accepting of the homosexuals, you know, I mean in your mind, it's not a bad thing I guess.

"[A.] It's a bad thing—no—just so I can clarify this.

"[Q.] Okay.

"[A.] I don't like what homosexual [sic] represent, you know, man and man or woman and woman. No, that's not what it's supposed to be like.

"[Q.] Okay.

"[A.] I know there's people probably out there like that in this world.

"[Q.] Mm-hm.

"[A.] And they're human just like me and you. I mean if I seen [sic] 'em, I aint' gonna yell derogatory words out or throw things at 'em or you know, some type of stuff like that.

"[Q.] Okay.

"[A.] I don't like what they do. I don't agree with what they do. God intended for a man and woman to be together, not man and man or woman and woman.

"[Q.] Okay.

"[A.] But I just—I don't hate 'em, I just don't agree with what they do or what they think. And as long as they don't press their ideas, beliefs on me or my family and all that, I don't have—I don't have a problem with them.

"[Q.] Okay.

"[A.] I just don't agree with what their ideas and beliefs are about . . .

"[Q.] So you're not by any means homosexual?

"[A.] No, no . . . ."

There was no objection to these portions of the video recording. Still later, Deputy Stahl returned to the question:

"[Q.] . . . [T]here are people out there—I'm being straightforward that like one particular sexual orientation; either it's young girls, it's black women, it's white women, it's adult males, young males. People like what they like.

. . . .

". . . [O]kay and no matter what, it would be hard for you to admit that. It would be hard to admit that, but my feeling is that that may be what you're drawn to. You're not going to tell me that and I understand that but what you really need to think about is if that's the case, if, you know, I mean, you have that right if that's what you like, that what you're . . .

"[A.] So you don't believe a word I'm sayin'?"

William's counsel objected to this passage, arguing Deputy Stahl "basically testifies about her opinion of the credibility of the parties involved." The district court overruled the objection. During Deputy Stahl's testimony the prosecutor also introduced a videotape entitled, *"Guys Going Crazy,"* found in a search of William's bedroom. The videotape featured men exposing their genitalia. Defense counsel did not object.

William's counsel did object to a photograph of a dildo found in Sharon's bedroom, arguing there was "no connection" between William and the item. The objection was overruled. William's counsel also objected generally to the relevance of Sharon's journals, eight in total, which law enforcement officers had seized from Sharon's bedroom. The prosecutor argued that the journals "show [William's] sexual orientation and they show his pattern of contact with [B.D.]." William's counsel responded that Deputy Stahl had not examined all of the journals, and "we don't know which ones she's looked at and which ones she hasn't looked at." The trial court admitted all of the journals without discussing their relevance.

When questioning Carla's former boyfriend, Christopher Kresyman, the prosecutor asked if he had ever "seen [William] with Brandon," and if he had noticed "anything unusual about them together." Kresyman said he had seen them together, but that he had not noticed anything unusual. The prosecutor then asked if he had "ever observed [William's] relation to sexual matters?" The trial court sustained defense counsel's objection as asked and answered. When Carla testified, the prosecutor asked whether William had "ever [made] any sexual advances towards you?" She denied that William had made any sexual advances toward her.

B.D. testified he could not state how long he had known William, and he could not remember when they had first met. He did not know how many times he had stayed at William's house. B.D. did testify to sleeping in William's bed, and that William "played with my weenie," and "put it in his mouth," and then B.D. "put it in [William's] butt." B.D. could not remember how many times the sex acts occurred, and he did not testify to any specific dates.

The State called Sharon as its final witness. The prosecutor asked Sharon, "[W]hat kind of friend is Brandon of [William's]?" When Sharon answered that they had worked for the same company, the prosecutor asked: "Did they ever have sex?" Sharon testified they had not, and when pressed by the prosecutor she responded: "Well I don't believe this would be something that I would have personal knowledge of."

The prosecutor then questioned Sharon about her conversations with William and the contents of her journals. For example, Sharon claimed a passage saying William and Brandon "have had sexual relations" was mistaken and should have read "that they have not had sexual relations." This referred to the incident highlighted by the prosecutor in the opening argument, when William allegedly woke Sharon and told her that Brandon had slept with someone else. The prosecutor's impeachment of Sharon on this and similar journal entries regarding William's relationship with Brandon continued for 11 pages of the trial transcript. Defense counsel made no objections.

In cross-examination, William's counsel asked Sharon if William had ever dated. When she replied yes, William's counsel elicited a woman's name and when the relationship had occurred. On redirect, the prosecutor established that the relationship was not mentioned by Sharon in her contemporaneous journals. The prosecutor then went on to establish that Brandon had lived at the Blomquist residence for a time, and that William had lived with Brandon. Questions followed from both prosecution and defense regarding why William had lived with Brandon and who else may have been living there at the time.

In closing arguments, the prosecutor acknowledged that only three of Sharon's journals "deal with these acts" concerning B.D. He asked rhetorically:

"So why do we have six [*sic*] more [journals] before those? Because in his interview [William] denies being a homosexual. Could he have said yes but I don't like little boys? Sure. But in those journals we have a whole year of Sharon's life and they show [William] with his boyfriend Brandon and their breakup shortly before this.

"Remember that [William] came into Sharon's room and was upset because Brandon had slept with someone else. . . .

. . . .
"As you will see in the journals, [William] was together with Brandon all the time."

Referring to the dispute over William's statement to Sharon about having sex with Brandon, the prosecutor argued: "He's either upset because they have or they haven't. Either way it says the same thing about [William]." The prosecutor referred to Sharon's testimony regarding William's dating relationship as "cover." He challenged the jury to "[f]ind it in the journal. She mentioned some girl possibly in [William's] life. You've got a whole year there. Find it." Lastly, the prosecutor argued that "[William] was the most helpful man that Carla ever knew. More helpful than any other man in her life and he didn't make any sort of sexual advances towards her." Defense counsel made no objections.

Instead, in closing argument William's counsel also spoke of his client's sexual orientation. Although William had not testified at trial, defense counsel pointed to his denial of homosexuality during Deputy Stahl's interview. William's counsel maintained the State was "asking you to guess based upon some very vague journal entries . . . . Why didn't they call Brandon?" An objection by the prosecutor was overruled, and counsel continued to ask why Brandon had not been called as a witness. The prosecutor replied in the State's concluding argument: "No evidence of [William's] being homosexual? How about what he told his mom that he had sex with Brandon."

The jury returned guilty verdicts on all 78 counts. William received a controlling sentence of 400 months' imprisonment. He filed a timely appeal.

### Prosecutorial Misconduct

William first contends the prosecutor's "irrelevant and highly prejudicial" references to homosexuality constituted prosecutorial misconduct. The State does not minimize its trial strategy, but asserts that "in a case in which a defendant is charged with aggravated indecent liberties with a child victim who is of the same sex as the defendant, the [S]tate is required to prove, beyond a reasonable doubt, that the defendant is a homosexual."

"A two-step analysis governs allegations of prosecutorial misconduct: it applies regardless of whether the alleged misconduct occurs during witness examination or during closing argument, and it applies regardless of whether a contemporaneous objection was made. The first step asks whether the complained-of conduct was outside the considerable latitude given a prosecutor in discussing the evidence. The second step asks whether the remarks constituted plain error, that is, whether the statements prejudiced the defendant and denied him a fair trial. The second step requires three factors to be considered: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence is so direct and overwhelming that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors, unless the statutory and federal harmless error tests have been met." *State v. Carter*, 284 Kan. 312, Syl. ¶ 7, 160 P.3d 457 (2007).

The State bases its assertion on the specific intent element of aggravated indecent liberties, which requires proof that the lewd fondling or touching was "done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both." K.S.A. 21-3504(a)(3)(A); *State v. Kessler*, 276 Kan. 202, 210, 73 P.3d 761 (2003). The State argues that "[s]ince it is required . . . [to] prove, beyond a reasonable doubt, that homosexual acts arouse or satisfy the sexual desires of [William], evidence of [William's] sexuality is relevant, probative, and *necessary*."

The obvious unstated premise of the State's argument is that lewd fondling or touching between an adult and a 12-year-old child of the same sex is a "homosexual act." Linguistically, a "homosexual act" might be defined as a sexual act between any two persons of the same sex; however, that is not how the State uses the term. The State maintains that if William took actions to satisfy sexual desires for adult males, and did not take actions indicating sexual desires for adult females, then any lewd fondling or touching of B.D. would be more likely to satisfy his sexual desires. The State, in other words, assumes that a sexual desire for children is among those desires which define a homosexual orientation.

We believe the Missouri Court of Appeals has identified the flaw in such an argument: "It is no more reasonable to assume that a preference for same gender adult sexual partners establishes a pro-

clivity for sexual gratification with same gender children than it is to assume that preference for opposite gender adult sexual partners establishes a proclivity for sexual gratification with opposite gender children." *State v. Ellis*, 820 S.W.2d 699, 702 (Mo. App. 1991). In the present case, as in *Sias v. State*, 416 So. 2d 1213, 1217 (Fla. Dist. App. 1982), there was "absolutely no showing that homosexuals as a group are disposed to engage in pederasty. [Citations omitted.]" We conclude, therefore, that it was unreasonable for the State to assume that a sexual desire for children is among those desires which define a homosexual orientation. See *Simon v. Simon*, 260 Kan. 731, 741, 924 P.2d 1255 (1996) (relevance is a matter of logic and experience).

Other courts have reached a similar conclusion. The Ohio Supreme Court has stated "evidence of homosexuality is not relevant to establish pedophilia," reasoning that the "existence or absence of [homosexuality] neither establishes nor disproves [pedophilia.]" *State v. Crotts*, 104 Ohio St. 3d 432, 434, 820 N.E.2d 302 (2004). The Wisconsin Court of Appeals found prejudice where evidence of homosexuality was improperly admitted under that state's "other acts" statute to prove wrongful sexual intercourse with a same-sex child. *State v. Rushing*, 197 Wis. 2d 631, 644-48, 541 N.W.2d 155 (1995). "There is a reasonable possibility that the jury drew impermissible inferences from [the witness's] testimony. Specifically, the jury may have concluded that because [the defendant] had a homosexual encounter with an adult, he is likely to have assaulted a child." 197 Wis. 2d at 649. The Minnesota Court of Appeals held evidence of homosexuality was irrelevant to prove criminal sexual conduct against two same-sex children. *State v. Bates*, 507 N.W.2d 847, 850, 852 (Minn. App. 1993). "The belief that homosexuals are attracted to prepubescent children is a baseless stereotype." 507 N.W.2d at 852.

Nevertheless, in this case, we are not presented with an evidentiary question. William's counsel did not challenge the evidence of William's sexual orientation on that basis. "A verdict . . . shall not be set aside . . . by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely

interposed and so stated as to make clear the specific ground of objection." K.S.A. 60-404.

Instead, we must decide whether the complained-of conduct was outside the considerable latitude given a prosecutor in discussing the evidence. In this regard, the State defends its actions based on the 26 counts of aggravated indecent liberties with a child. The State, however, makes no effort to justify its trial strategy with regard to the 52 remaining counts.

Nothing in this record suggests that William's adult relationships with Brandon, Carla, or any woman he may have dated were evidence of the charges against him. Given the "prejudicial character" of homosexuality, *Bates*, 507 N.W.2d at 852, the prosecutor's conduct in this case was analogous to prosecutorial appeals to passion, prejudice, and fear which have been so long rejected by Kansas courts. See *In re Care & Treatment of Ward*, 35 Kan. App. 2d 356, 376-78, 131 P.3d 540, *rev. denied* 282 Kan. 789 (2006) (listing cases). Having carefully considered the record, we hold the prosecutor's conduct was improper. See *State v. Tosh*, 278 Kan. 83, 90-92, 91 P.3d 1204 (2004).

Turning to the plain error analysis, we are convinced the prosecutor's misconduct was gross and flagrant. The references to homosexuality were not an "isolated statement." *Carter*, 284 Kan. at 327. As detailed earlier, the prosecutor's opening statement, questions of witnesses, presentation of evidence, and closing argument were focused on proof of William's sexual orientation. Given the prejudicial nature of homosexuality, we conclude William has shown the evidence at issue and the prosecutor's comments upon it prejudiced the jury against him. See *State v. Sappington*, 285 Kan. 176, 186, 169 P.3d 1107 (2007) (stating the test for gross and flagrant misconduct is whether it prejudiced the jury against the defendant, citing *State v. Elnicki*, 279 Kan. 47, 65, 105 P.3d 1222 [2005]).

We are unable to conclude, however, that the prosecutor bore ill will. This is not a subject matter on which Kansas appellate courts have "clearly cautioned" prosecutors. *Elnicki*, 279 Kan. at 66. There were also no sustained objections or other rulings by the trial court to which the prosecutor showed "indifference." *State v.*

*McHenry*, 276 Kan. 513, 525, 78 P.3d 403 (2003). Based on our review of the record, "the lack of such conduct shows there was no ill will." 276 Kan. at 525.

We raise a caveat, however, based on certain ambiguous arguments in the State's brief. Echoing a statement made by the prosecutor during closing arguments, the State contends that "[h]ad [William] adopted as his defense . . . that he was sexually attracted to males but not to children, it would not have been necessary to introduce evidence of his homosexuality." William's mistake, according to the State, was to "not understand that other homosexuals are not necessarily attracted to children." The State asserts that because William "went to extreme lengths to conceal his sexuality," it was necessary to introduce evidence of his homosexuality.

We do not agree, based on this record, that William placed his sexual orientation at issue. Rather, it was the prosecutor who within moments of the trial's commencement labeled William a homosexual and proceeded to develop the State's case-in-chief around William's purported sexual orientation. We read the balance of the State's arguments on appeal as leaving intact its assumption regarding homosexuality and a sexual desire for children. If that were not the State's assumption, nothing would be left of its trial strategy but a pure appeal to prejudice. See *United States v. Birrell*, 421 F.2d 665, 666 n.2 (9th Cir. 1970) (reversing a theft conviction where prosecutor argued defendant would "be a homosexual and a car thief . . . for the rest of his natural life"). We would not hesitate to find ill will in such a situation.

Finally, we must determine whether the trial evidence was so direct and overwhelming that the misconduct would likely have had little weight in the minds of jurors. The State's evidence that each of the three charged crimes occurred on the dates recorded by Sharon was limited to B.D.'s testimony. After B.D. described William's actions in general terms, the prosecutor asked the following questions:

"Q. Do you know about how many times you and [William] did that?
"A. Uh, I don't remember.
"Q. Did it—Do you remember how many times you stayed at his house?

"A. No.
"Q. Well, did it always happen?
"A. Yeah."

The prosecutor later asked B.D., "Did a typical weekend include splooging [sic]?" "Splooge" was B.D.'s word for ejaculation. B.D. answered, "Yes."

This testimony was not direct and overwhelming. William does not challenge the sufficiency of the evidence, but even so an inference was required. The inference, that William committed each of the acts charged during every overnight stay shown in Sharon's journals, was susceptible to the prosecutor's misconduct. We cannot say that the error was harmless under either K.S.A. 60-261 or *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967); see *Carter*, 284 Kan. at 327. Accordingly, we reverse the convictions and remand for a new trial.

### Cumulative Error

Our decision "is greatly strengthened" by William's further allegations of error. See *Elnicki*, 279 Kan. at 67. Because we further conclude that cumulative errors prevented William from receiving a fair trial, we need not determine whether the other errors William identifies constitute reversible error or simply harmless error under K.S.A. 60-261. See 279 Kan. at 68. Considered cumulatively, the trial errors also justify reversal of his convictions and remand for a new trial. See 279 Kan. at 68.

William first contests the testimony of Joel Schauf, a licensed school psychologist. Schauf was allowed to testify, over William's objection, that B.D's family fit the "profile" of child abuse victims because it featured "[a] child that doesn't have a stable dad figure in the home, multiple moves, those sorts of things." Under the facts of this case, the trial court's ruling is reviewed for abuse of discretion. See *State v. Copperwood*, 282 Kan. 572, 576, 147 P.3d 125 (2006).

Kansas allows profile testimony where "the victim exhibited behavior consistent with a child who had been sexually abused." *State v. McIntosh*, 274 Kan. 939, 956, 58 P.3d 716 (2002). Schauf, on the other hand, testified more generally about social circumstances

which may provide an environment that makes a child susceptible to sexual abuse.

We doubt the admissibility of such testimony, but the initial problem is the lack of foundation for Schauf's testimony. We reject the State's assertion that Schauf's testimony was lay opinion under K.S.A. 60-456(a). On the contrary, his testimony was the type of "interpretation of technical facts" or specialized "material in evidence" which constitutes expert opinion. See *State v. Struzik*, 269 Kan. 95, 99, 5 P.3d 502 (2000). Schauf's opinions were also not "incidental to [his] actual knowledge of the facts and circumstances of the case." *Moore v. Associated Material & Supply Co.*, 263 Kan. 226, Syl. ¶ 10, 948 P.2d 652 (1997). The State elicited nothing of substance beyond Schauf's testimony regarding B.D.'s family dynamics.

As a result, as the State alternatively argues, Schauf's testimony could only be admissible as expert opinion. The State, however, failed to lay an adequate foundation for Schauf's opinions. An expert may only offer opinions "based on facts or data perceived by or personally known or made known to the witness at the hearing." K.S.A. 60-456(b)(1). "It is necessary that the facts upon which an expert relies for his or her opinion should afford a reasonably accurate basis for his or her conclusions as distinguished from mere guess or conjecture." *Struzik*, 269 Kan. at 99.

Schauf gave B.D. an intelligence test 5 years before trial. Aside from this test, his only contact with B.D. was his work with "220 kids . . . in this district. I have contact sometimes briefly with all of them." Schauf said he knew Carla, and that he knew of B.D.'s older brothers. The only testimony concerning Schauf's knowledge of other families was the conclusory statement that he had "worked with sexually abused children . . . . between '95 and '97." Nothing in the record shows Schauf based his opinions on facts presented at the trial.

"The proponent of expert opinion testimony must lay the foundation" for admission. *State v. Lawrence*, 281 Kan. 1081, 1088, 135 P.3d 1211 (2006). Based on the foundation laid at this trial, Schauf did not have a reasonably accurate basis for his conclusions. His contact with B.D. and his family was limited. There was no testi-

mony that Schauf had conducted a psychological evaluation or home study of B.D.'s family, much less that of other families with a sexually abused child. See *State v. Papen*, 274 Kan. 149, 155, 159, 50 P.3d 37 (2002) (questioning opinion of expert psychological witness where expert had no contact with the couple at issue). The trial court abused its discretion in allowing Schauf's testimony.

William also contends that the trial court erred in refusing to redact Deputy Stahl's statements from the police interview which suggested that William was sexually attracted to males but would not admit to it. The State argues that Williams' counsel failed to contemporaneously object to the admission of the video recording, but the record shows admissibility was raised and discussed just before the Deputy Stahl was called to the stand. The trial judge informed counsel that it would "allow [the video recording] to be submitted in the form that it's now proposed. I make that ruling." Under these circumstances, and considering that the issue may recur on remand, we will review the ruling.

We agree Deputy Stahl improperly commented on William's veracity. Although the deputy referred to several types of persons who might be the object of sexual desire, she concluded with "adult males, young males," the types of persons about whom the deputy had already questioned William. William had denied a homosexual orientation, and he had denied sexually abusing B.D. When Deputy Stahl challenged William's denials with the "feeling" that he would not admit to his sexual desires, the implication was clear. While Deputy Stahl's conduct was more subtle than was displayed in *Elnicki*, we believe the rule announced in that case against allowing "a witness to express an opinion on the credibility of another witness" is applicable. 279 Kan. 47, Syl. ¶ 3.

Finally, William contends the district court erred in the admission of the photograph of the dildo found in Sharon's bedroom drawer. The State argued at trial that the item was relevant for impeachment because William denied there was any pornography in his home. On appeal, William disputes the notion that the photograph was introduced in order to prove that he lied. William maintains the dildo was not pornographic material, that there was no evidence he possessed it, and that the item was only under

Sharon's control. William claims the photograph was prejudicial because the "erotic nature" of the item pictured served to inflame the prejudices of the jury.

A trial court has broad discretion regarding the admission of photographs. To determine whether photographs should be admitted, a trial court must decide whether they are relevant and whether a proper foundation has been laid. *State v. Kirby*, 272 Kan. 1170, 1186, 39 P.3d 1 (2002).

The undisputed testimony was that the dildo in the photograph was found in Sharon's bedroom. B.D. testified he occasionally went into Sharon's bedroom, but he never looked in the drawer. There was also no testimony that this item was used in any sexual assault upon B.D. During Deputy Stahl's interview, William denied that he had pornography in the house. We find nothing about this colloquy that made the existence of a dildo found in his mother's bedroom relevant to impeach William. The district court erred in the admission of the photograph.

William raises other issues, but given our ruling we need not address them.

We hold that William was deprived of a fair trial by prosecutorial misconduct and by cumulative error.

The convictions are reversed, and the case is remanded for a new trial.